## SURRY LUMBER COMPANY *v.* EDWARD ZISSETT ET AL.

*Negligence—Res Ipsa Loquitur—Fall of Pile of Lumber— Independent Contractor—Acceptance of Work— Instructions.*

In a suit for injuries caused by the fall of a pile of lumber belonging to defendant, in which the testimony offered by plaintiff showed that the fall of the lumber resulted either from defendant's negligence, or from the acts of men working on the pile, who were employees of an independent contractor or persons having no connection with defendant, it was error to instruct the jury that, although the lumber was piled by an independent contractor, if the work had been accepted by defendant, and plaintiff was injured while exercising due care, their verdict must be for plaintiff, unless defendant satisfied the jury by a preponderance of the testimony that the fall of the lumber was not due to its negligence, since this raised a presumption of negligence against defendant from the mere fall of a pile of lumber upon which men not shown to have any connection with defendant were at work.

pp. 504-507

Defendant, who employed an independent contractor to pile lumber on a city dock, in a place designated by a public official in charge of the dock, was not liable for injuries caused by the fall of a pile of lumber, which was under the control of the contractor in the execution of his contract, as a result of negligence of the contractor's employees, which defendant was not bound to anticipate, and which was not a natural consequence of the contract.

pp. 507-508

Where there was evidence that the employees of an independent contractor, employed by defendant, were still at work on a pile of lumber belonging to defendant at the time of its fall, resulting in injury to plaintiff, it was error to instruct the jury that defendant was liable if the contractor had fully piled and completed the pile, and it was under defendant's control and had been accepted by it, unless defendant showed

that the fall was not due to its negligence, since this excluded
from the consideration of the jury the evidence referred to.

p. 508

The mere fact that certain unidentified men were seen on
a pile of lumber belonging to defendant, on a public dock where
lumber belonging to others was also piled, did not raise any
presumption that such men were the servants of defendant, it
affirmatively appearing that the pile had been placed there by
an independent contractor for defendant, and it not appearing
that the work which they were doing was or was not beneficial
to defendant.                          p. 509

In an action for injuries to plaintiff caused by the fall of a
pile of lumber belonging to defendant, it was proper to refuse
to direct a verdict for the owner of the lumber, when there
was some evidence from which the jury could find that, when
the pile fell, the contractor engaged by defendant to do the
piling had completed and left the pile, and that no person was
on or near it, the doctrine of *res ipsa loquitur* raising under
such circumstances a presumption of negligence against the
owner.                          pp. 509, 510

In an action on account of negligence, the jury may find a
verdict for the plaintiff, even though, in order to do so, they
must disregard the testimony of plaintiff and his witnesses,
provided the verdict is justified by defendant's witnesses.  p. 510

That a contractor engaged to pile a cargo of lumber for
defendant had not finished piling the entire cargo at the time
of the fall of a completed pile, by which fall plaintiff was
injured, did not show that the completed pile still remained
under the contractor's control, after the contractee had had
time, by the exercise of reasonable care and diligence, to have
learned that the pile had been completed and to have observed
its condition, this latter being upon the facts a question for the
jury.                          p. 510

In an action for injuries caused plaintiff, while working on
a pier, by the fall of a pile of lumber, part of a cargo belong-
ing to defendant which was being unloaded from a vessel, an
instruction that if a person named contracted with defendant
to discharge the cargo and pile it on the pier at a price per

thousand feet, he was an independent contractor for whose negligence defendant was not responsible, and the verdict should be in defendant's favor, was properly refused, there being some evidence from which the jury might infer that defendant had itself been negligent.                    p. 511

*Decided April 8th, 1926.*

Appeal from the Court of Common Pleas of Baltimore City (DUFFY, J.).

Action by Edward Zissett, to the use of the Phoenix Indemnity Company, and the Phoenix Indemnity Company, for the benefit of said company and of Edward Zissett, against the Surry Lumber Company and Clayton Jackson. From a judgment against it, defendant company appeals. Reversed.

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*J. Marsh Matthews,* with whom was *George P. Bagby* on the brief, for the appellant.

*Julius F. Sandrock* and *Joseph Tyler England,* with whom were *Tyler & England* on the brief, for the appellees.

OFFUTT, J., delivered the opinion of the Court.

On October 6th, 1924, a schooner, the Emily Katherine, carrying a cargo belonging to the Surry Lumber Company, a corporation engaged in the wholesale lumber business in Baltimore City, arrived at Baltimore and proceeded to Pier 6, Pratt Street, a public dock of Baltimore City, to dock and to unload its cargo on a space on that dock or wharf, which had been allotted at its request to the lumber company for that purpose by the Harbor Master of Baltimore City at a rental of twenty cents for each thousand feet of lumber stored thereon. On the same day the lumber company gave a contract for unloading the vessel to Clayton Jackson, a "stevedore contractor," at "so much" per thousand feet.

The lumber was in two sizes, 2 x 4 and 2 x 6, and Jackson first unloaded and piled up the 2 x 4 lumber on the dock and then the 2 x 6 size. Theodore Mottu & Company had also at that time lumber piled on the same dock and, during the unloading of the Emily Katherine, was engaged in loading it on a truck operated by its employees. Edward Zissett, an employee of Mottu & Company, helped to load its truck, and as he was carrying lumber from its pile on the dock to its truck, one of the piles of 2 x 4 lumber belonging to the Surry Lumber Company "buckled" and fell, partly covering him, breaking his right leg, and otherwise injuring him.

While it is quite impossible from the record to say what were the relative positions of Zissett, the Surry Company's lumber, the Mottu Company's lumber, and the truck, it does appear that the pile which fell was about ten feet from the pile at which Zissett was working.

As a result of the accident, Zissett was badly injured and was for some time unable to engage in his ordinary work, and incurred expenses for hospital and surgical attendance and treatment, on account of which he applied for and was allowed twelve dollars a week by The Industrial Accident Commission during the period of his disability. And on January 16th, 1925, he and the Phoenix Indemnity Company (which paid the compensation) brought this suit against the appellant and Clayton Jackson to recover compensation for his injuries and the losses incidental thereto. The trial resulted in a verdict for Jackson, and against the appellant, and from the judgment on the verdict against it the Surry Lumber Company took this appeal.

At the conclusion of the whole case the plaintiff offered two prayers, which the court granted, and the defendant seven, of which the court granted two and refused the rest, and those rulings are the subject of the only exception submitted by the record.

The refused prayers were designated "Defendant's First," "Third," "A," "B" and "D" prayers. Its "First" and

"A" prayers were demurrers to the whole evidence irrespective of the pleadings; its "Third" prayer was intended to present the proposition that if the accident was caused by the plaintiff's negligence he could not recover; its "B" prayer instructed the jury that if they found that Jackson contracted with the Surry Lumber Company to discharge the cargo of lumber and pile it on the pier at a set price per thousand feet, that he was an independent contractor for whose negligence the Surry Lumber Company was not responsible, and that their verdict should be in its favor, and its "D" prayer submitted the theory that if Jackson was a capable and experienced stevedore and was employed as an independent contractor by the appellant to unload the cargo of lumber, that the plaintiff could not recover even though the lumber which fell on the plaintiff had been piled in a negligent and unskilled manner by Jackson's employees.

The plaintiff's first prayer submitted the proposition that whether Jackson was or was not an independent contractor, if, when the accident happened, he had fully piled and completed the pile of lumber which fell and injured the plaintiff and it had been accepted by the Surry Lumber Company, and "that the plaintiff, while standing and loading lumber from the adjoining pile, as set forth in the evidence, was struck and injured by the lumber from the pile of the Surry Lumber Company, suddenly falling upon and over him, when he, the plaintiff, was exercising due care, if the jury so believe, then their verdict must be for the plaintiff and against the Surry Lumber Company, unless that defendant by preponderance of testimony satisfies the minds of the jury that the falling of said lumber was not caused by its negligence." His second prayer instructed the jury as to the measure of damages applicable to the facts of the case and was in a form repeatedly approved by this court and need not be further referred to.

From these prayers it appears that the plaintiff rested his right to recover upon the theory that a presumption of negligence arose from the mere fall of the pile of lumber which

injured him, and that, having proved the fall and the injury
at a time when the pile of lumber which fell was under the
appellant's control, he was entitled to recover unless the
defendant, the Surry Lumber Company, affirmatively proved
that its fall was not occasioned by any negligence or default
on its part, while the defence of the appellant was that (1)
the doctrine of *res ipsa loquitur* was not applicable to the
facts of this case, and (2) that when the accident happened
the pile of lumber which fell on and injured the plaintiff
was under the control of an independent contractor for whose
negligence or default it was not answerable. We will there-
fore consider in connection with those contentions the evi-
dence submitted by the record.

Edward Zissett, the plaintiff, after testifying that he had
been directed by Theodore Mottu & Company, by which he
was employed to help load some lumber which it had on
Pier 6 on its trucks, said that when the last truck came to
"finish up the pile" he had "moved to feed on the off side,"
"where they were piling this pile to make them handy for me
to get it on the truck when he gets in" and that some colored
men were "piling on the other pile." He was then asked to
tell just what happened, but his statement in reply to that
question, as well as the testimony of other witnesses to which
we will refer, is to some extent unintelligible because of his
constant use of such indefinite expressions as "here" and
"there" and "this," which may have been perfectly intelli-
gible to the jury, but which are quite meaningless to us, in
the absence of any chart or diagram illustrating their appli-
cation, as will appear from this quotation from his testimony:
"Say, for instance, this is the pile they were piling. There
was another pile up here, like this, and our pile was right
in here, this here space, about ten feet, and this pile wasn't
any more than about this high (indicating), and this pile
they were piling was, I guess, ten or twelve feet high, and
at the time, they were still piling on it; and I put the lumber
over here, because there was a pile right in front of this, you

see, on the driveway, which was back there, and the pile
over here on the driveway was about there, and the pile over
here on the driveway was about here (indicating). Well, I
put it over here, so that I could make it handy to get on the
truck, took it all away from this pile, and I had to put it
all on the truck excepting, I guess, eight or ten pieces of
2 x 8's twelve feet long. And when I stooped down to pick
it up, which is about the middle of the pile—there was the
truck, backed down that way (indicating), and just as I
stooped down the whole pile came right on top of me. * * *
Well, where were you standing with reference to this pile?
A. I was standing right there (indicating). And I had
these scantlings piled against here, and this pile, I guess,
wasn't over four or five feet high. That was the only thing
that saved my head, otherwise it would have knocked me
clean down, and all of that hit me, and I had an eye like
that, and I was bleeding like anything." He further testified
to the extent of his injuries, his medical and hospital ex-
penses, and the duration of his disability resulting from the
accident. On cross-examination he gave in part this testi-
mony: "Q. Who was present at this accident besides your-
self? A. Why, Mr. Sherfey was the only one that was at
the truck, but all of those men were piling the lumber off
the boat. Q. Well, where were the men that were piling this
pile of lumber that you describe? A. Right on top of
the pile. They seen when the lumber fell on me, because they
were on the pile when the lumber fell on me. Q. And they
fell down with the lumber, did they? A. I couldn't tell you
that, with the misery I had. I wanted to get the lumber off
of me. They must have fell on top of me, they must have
come down with the lumber, because they were piling it.
* * * I had my back turned to the pile that fell on me, and
I was picking up and putting on those few pieces I had left,
to finish up that place back there, to clean it up, and there
were only a few pieces left there, and when I turned around,
like that, stooped down, like that, to pick up the pieces of

2 x 8, twelve feet long, just a's I picked it up that way, the whole thing came right down on me." On re-direct he added that he was at least ten feet away from the pile which fell, that he neither touched it nor went near it, but that he saw "them piling it, that's all, throwing it up there."

Charles H. Sherfey, chauffeur, who wa's driving the truck upon which Zissett was loading Mottu & Company's lumber, and who was present at the accident, testified that Clayton Jackson and his "gang of stevedores" were loading "the lumber on the pile which fell"; that the foreman of the stevedores told him that they were loading it for the Surry Lumber Company: that the pile which fell contained 2 x 4 lumber from ten to sixteen feet long, and was about ten feet high. He further testified that he and Zissett were at the truck which was backed up at the Mottu Company's lumber pile when the pile of 2 x 4 lumber owned by appellant fell, that it covered up Zissett and knocked the witness back of the truck, but that as he was "young and supple" he quickly got up and called for help for Zissett; that when he asked Jackson for help, he refused and told him that "he could not be bothered," but that some of the men on the dock came over and helped remove the lumber from Zissett. When asked whether he had noticed the "Surry lumber pile," he said: "Well, when I came in there, I didn't take particular notice, because I was in a hurry to get back, and I came back only to get those few pieces and I didn't take much notice of the pile, but I know that they were up on it piling. Q. How many men were working on it, piling it? A. Well, I won't say for sure, I know there was a few men up on the pile, piling it up. They were kind of up the steps like, piling the stuff up high, you know, in layers like, pulling it up on a slope. Q. Well, what methods were they using in piling up there? A. Only just handing them up to each other, you know, and placing them down. Q. And where were they getting the lumber from that they were piling? A. They were getting it off of this Kathaline." The witness was then asked whether

the "pile had been tied," and in reply he said: "Well, after I came back to get Mr. Zissett, I investigated after I came back and I seen it was very haphazard put up; I mean it wasn't put up properly like it should have been, but it looked like where they dropped the stuff it was just left lay, and it wasn't very likely to stay there any length of time, of course, a pile like that, putting up scantlings like, should be tied, which they weren't doing."

This was in substance all the testimony offered by the plaintiff bearing directly upon the circumstance surrounding the happening of the accident of which he complains.

On behalf of the defendant, James B. Blake, city salesman for the appellant, testified that he had charge of the "wharf" for it, that he saw the pile of lumber which injured the plaintiff, but that he "went away" before it was completed; that it was brought from the James River for the Surry Lumber Company in the schooner Emily Katherine, and that when that vessel arrived witness applied to the harbor master for a place to dock it and was allotted a space on Pier No. 6 by him; that then the Surry Lumber Company gave a contract for unloading it to Clayton Jackson, a stevedore; that such contracts were given out at so much per thousand feet; that Jackson was an efficient stevedore and his services were in such demand that they were at a premium; that the 2 x 4 lumber was piled in the "regular and usual" manner and "tied" at intervals by placing sticks transversely across the courses. On cross-examination he testified that his company did not deliver any lumber, that they sell it and "mark it up" and that then their responsibility ceases; that he was at the pier every day, not all the time, probably an hour a day, and that his duties were "to see that the lumber was put out in shipshape, as we term it, to watch the lumber and see what it looked like. We had to sell it and I wanted to see what grade lumber it was and how it was manufactured, so that I could talk about it and sell it. No two piles of lumber are identical. * * * Just see that the vessels get

docked or the barges get docked and properly discharged, and put out in the shape I want it to dispose of to the best advantage." On his redirect examination he said that Clayton Jackson, in reporting the accident to him, said that the men loading the 2 x 8 lumber on the truck had placed a piece of scantling against the pile which fell and were throwing their 2 x 8 pieces on it" so that the trough could receive it." and that he had crawled under that scantling a short time before the accident happened.

Daniel Campbell, the harbor master, said that he had leased a space on Pier 6 to the Surry Lumber Company at the time the accident happened, at twenty cents per thousand feet; that he had known Clayton Jackson in the course of his work at the city docks for five or six years, and that his work had been satisfactory and in "conformity with the rules and regulations of the dock."

Clayton Jackson testified that he was a stevedore contractor; that he contracted with the appellant to discharge a cargo of lumber from the schooner Emily Katherine on October 4th, 5th or 6th, 1924, and that he discharged it at Pier No. 6; that he had seen the pile of 2 x 4 lumber just before it fell, and to quote his testimony: "A. Yes, sir; I just had came along, I just had came from another boat I had, the Nankista, and walked under a piece where this gentleman had resting on the 2 x 4's and on another pile of lumber, which belongs to Mr. Zouck, throwing these 2 x 8's on it, and I just had to bow my head and I stepped on the boat when I heard the rumble, and then when I heard the rumble I stepped back, and this man was hollering, and the men ran over and lifted the scantlings off of him, and this piece he had across the pile of scantlings, he had put it on this other pile by the truck, and from the jar, naturally, it had throwed my scantlings; but we weren't working on the scantlings at that time. The scantlings had been finished some time." He further testified that "just as I got on the boat I heard a rumble and when I stepped back and looked at

the pile, this pile had fell and caught this gentleman who was putting the lumber on, and the scantling what he had resting on my lumber and on Zouck's lumber had broke and from that the pile fell down"; and that when he heard "somebody holler" he "stepped right back forward and looked, and this man was hollering, and I hollered for the men and they shut the boat right down and they all run there and taken them off, and I suppose it was about five or six hundred feet had fell and caught his leg, but the piece he had on my scantlings, and resting on the other scantlings, it saved the scantlings off his head, the piece he had put up on these scantlings, that saved his head, and the few scantlings that fell, we ran down and took them off." He also testified that the pile which fell was "tied" every eighteen inches or two feet with inch boards or pieces; that when it fell the pile had been finished over half an hour and that there was not "a soul" on it.

Grover Banks, foreman of the stevedores who piled the lumber which fell on the plaintiff, testified that it was piled in the "usual and regular" way, and "tied" at intervals of eighteen inches or two feet, and that the pile was about eight feet high; and "they were loading the Mottu truck—this piece running across Mr. Zouck's lumber and come across to these 2 x 4's is what buckled the pile and broke it down"; that he had been working on the dock for thirteen years "off and on" and had never had a "pile do that before"; and that the pile of lumber was "finished" when it fell.

Robert Bailey and Earnest Stokes, stevedores, who helped pile the lumber which fell, corroborated Banks as to the manner in which it was piled.

Zissett and Sherfey in rebuttal denied that either of them had placed or used in loading their truck a scantling which rested on the pile of lumber which fell.

Reverting now to the several prayers involved in the exception, it appears that the plaintiff's first prayer is based upon the language of the court in *Strasburger v. Vogel,* 103 Md.

85, but an examination of that case shows that, although the
Court said such an instruction would have been correct if
the plaintiff's case had rested "exclusively upon an infer-
ence of negligence deduced from the single fact that the
bricks fell without an apparent or assigned cause; and if the
defendant had, by way of answer to that theory, relied upon
the intervention of an independent agency," it further said:
"But when the plaintiff himself shows that the injury com-
plained of must have resulted either from the negligence of
the defendant or from an independent cause for the exist-
ence of which the defendant is in no way responsible, he
cannot be permitted to recover until he excludes the inde-
pendent cause as the efficient and proximate cause of the
injury, and an instruction which allows a recovery without
any reference whatever to such efficient and proximate cause
is essentially misleading and erroneous," and it held that
such a prayer was not applicable to the facts of that case. A
comparison of these two cases discloses a very striking anal-
ogy. They cannot be distinguished in principle, and it is
difficult to see upon what theory consistent with the authority
of that case the plaintiff's first prayer can be sustained. If
the testimony offered by the plaintiff is to be believed, the
fall of the lumber in this case, as the fall of the bricks in
*Strasburger v. Vogel, supra,* must have resulted either from
the negligence of the defendant or from some independent
agency for which it was not answerable. That is to say,
Zissett himself and Sherfey, the only witnesses offered by
the plaintiff who testified to the actual happening of the
accident, said that when the lumber fell, men were actually
working on it, and that as the lumber fell they must have
fallen with it, "because they were piling it," and it further
appears from the testimony that these men were either the
employees of an independent contractor engaged in work
covered by the contract, or they were strangers without any
apparent connection with the defendant, the Surry Lumber
Company, and in neither case would the appellant have been
responsible for their acts, under the facts of this case. Zis-

sett, when asked what men were on the pile which fell said:
"Those colored fellows were unloading a boat there.    Q.
Well, do you know who they were? A. They were—or, what's
the name of the foreman there? What was their name, now?
Q. Do you recall his name?    (Mr. Matthews) : Jackson?    Q.
(Mr. England) : Was his name Clayton Jackson? A. Clay-
ton Jackson, that's right, Clayton Jackson," and Sherfey was
almost as indefinite.    He said: "I inquired around in the
morning before I started on this pile, I made inquiries and
tried to find out then before anything happened, and the
foreman of the stevedores told me they were unloading it
for the Surry Lumber Company."

It appears from the testimony of Herbert Zissett that the
accident occurred in the afternoon, and while Sherfey said
that when the pile fell there "were a few men up on top
of the pile, piling it up," he did not say that they were the
men he had seen in the morning, nor did he say by whom
they were employed.    That Jackson acted as an independent
contractor in discharging the appellant's cargo of the lumber
and piling it on the dock we have no doubt.    Some impor-
tance is attributed by the appellees to the statement of Blake,
appellant's agent, that he had charge of the wharf and was
there to see that the lumber was put "in ship-shape," but
those expressions cannot be isolated from the rest of the
testimony and construed without reference to anything else
he said, and; considering his entire testimony, there is noth-
ing in it to justify the inference that he had or assumed any
control over the actual work of unloading the vessel or piling
the lumber on the dock, and it is undisputed that he was not
present when the pile which fell was completed.

The appellees, however, contend that, conceding that Jack-
son was an independent contractor, his contract in respect
to the pile of lumber which fell had been completed, and
that upon its completion it immediately became subject to
the care and control of the Surry Lumber Company and
that it is chargeable with negligence merely because the pile

fell.  But assuming that the doctrine of *res ipsa loquitur* applies to such an accident, that contention cannot be sustained in respect to this prayer, because, as stated in *Strasburger v. Vogel, supra,* when a plaintiff relies upon that doctrine it must not appear from his evidence or that adduced in his behalf that causes for which the defendant was not responsible produced the injury for which damages are sought, while in this case it does appear from the appellees' evidence that the accident occurred at a time when persons either in the employ of an independent contractor for whose acts the appellant was not answerable, or persons not shown to have had any connection at all with the appellant, were at work on it, and the ordinary and natural inference would be that its fall was occasioned by some act or negligence of theirs.                                      ,

And if at the time the lumber fell they were in the employ of Jackson and piling the lumber for him in the execution of a contract between him and the appellant, the appellant was not responsible for their acts, any more than the defendant in *Strasburger v. Vogel* was responsible for the acts of strangers, who had come upon his premises, and carelessly dislodged a brick from a chimney thereon.  For in this case the liability of the appellant depends, not upon whether Jackson was guilty of negligence in piling the lumber under the contract, but whether it was guilty of negligence in contracting at all with Jackson to pile the lumber, or whether it negligently permitted it to remain in a dangerous condition after Jackson had completed and it had accepted the pile.  There is a class of cases, in which the thing to be done is of such a character that the defendant, in an action to recover damages for injuries resulting therefrom, is bound to anticipate that such injuries may naturally result from it, or where the mere doing of the work involves the violation of a duty, to which the defence of independent contractor is not applicable.  *City and Suburban Rwy. Co. v. Moores,* 80 Md. 355.  The application of that principal is

illustrated by such cases as *Ver-Vac Bottling Co. v. Hinson,* 147 Md. 272. But this case does not fall within that class, because here the work to be done was lawful, the place where it was to be done had been set apart by a public official having control thereof for the very purpose of storing the lumber, and there was nothing in the character of the work to be done which required the appellant to anticipate that injury might result from it if it were carefully and skilfully done. Under such conditions the rule stated in *City and Suburban Rwy. v. Moores, supra,* and *Weilbacher v. Putts Co.,* 123 Md. 255, is applicable, and the appellant would not be responsible if, at the time the accident happened, the pile of lumber which fell was under the control of Jackson, and its fall was due to some negligence on the part of his employees, which the appellant was not bound to anticipate, which was collateral to the contract, and not a natural consequence thereof. *Symons v. Road Directors,* 105 Md. 254; *Deford v. Keyser,* 30 Md. 179, 39 C. J. 1324. And it seems unnecessary to add that it would not have been responsible if the fall was due to the acts of persons not in the employ or control of either Jackson or the appellant.

And the plaintiff's prayer, in instructing the jury that, if they found that Jackson had fully piled and completed the pile of lumber which injured Zissett, and that it was under the control of the appellant and had been accepted by it, and that it fell and injured the plaintiff, that the plaintiff was entitled to recover, unless the appellant showed by a preponderance of testimony that the fall was not due to its negligence, went too far. Assuming without deciding that that is a correct statement of an abstract legal principle, it is inapplicable to the facts of this case, and very misleading. It excluded from the consideration of the jury all the plaintiff's evidence which tended to show that when the pile fell the employees of Jackson were still at work on it piling it up. And although the plaintiff's own testimony showed that men were at work on the pile when it fell, it permitted the plaintiff to recover, even though they believed its fall was

due to some act of those men, who were not shown to have had any connection with the appellant, unless the appellant showed that the fall was not due to its negligence. If, as the prayer predicates, Jackson had completed the pile when it fell, it is obvious that the men on it were not his employees, and there is no evidence of any kind that, at the time it fell, any agent or employee of the appellant was on the dock, so that if men were on the pile, as the plaintiff testified, it cannot be assumed that they were employed either by Jackson or the appellant. And yet that prayer raises a presumption of negligence against the appellant from the mere fall of a pile of lumber upon which men not affirmatively shown to have had any connection with it were at work. We know of no authority for that proposition and it is in direct conflict with *Strasburger v. Vogel, supra.* It has been held that the relation of master and servant may be presumed from the mere fact that a person was engaged on the master's premises in performing work beneficial to him (14 R. C. L. 78), but that rule has been held not to apply where the work being done is of a character which, as a matter of universal and common knowledge, persons do not usually employ their servants to perform, such as the repair of roofs. *Welfare v. London and Brighton Rwy. Co.,* L. R. 4 Q. B. 693. And in this case we do not think that that presumption should be drawn from the mere fact that certain unidentified men were seen on a pile of lumber belonging to the appellant, on a public dock where lumber belonging to others was also piled, where it affirmatively appeared that it had been placed there by an independent contractor, and where it does not appear that the work which they were doing was or was not beneficial to the appellant.

The defendant's "First" and "A" prayers were properly refused. For while the plaintiff's evidence showed that when the pile fell, men were at work on it, that testimony was contradicted by the defendants. And as the jury were entitled to pass upon all the evidence (*Consol. Ry. v. Pierce,* 89 Md. 504), there was some evidence in the case from which they

could have found that, when the pile fell, the contractor had completed and left it, and that no person was on or near it, and under such circumstances thé doctrine of *res ipsa loquitur* would have raised a presumption of negligence against the owner.

It is true that, to have reached that conclusion, the jury must have disregarded the testimony of the plaintiff's witnesses as well as that of the plaintiff himself, but our predecessors held, in the case last cited, that they were permitted to do that, and to find a verdict in his favor, which was justified by the defendant's evidence, even though it contradicted that of the plaintiff.

It is not disputed that, when the pile of 2 x 4 lumber fell, Jackson had not completed unloading and piling the entire cargo. The defendant argues from that, that even though Jackson had completed piling the 2 x 4 lumber, the completed pile remained under his control until he finished unloading and piling the entire cargo. But we cannot accept that conclusion. It is true that Jackson contracted to unload the entire cargo but, after he had fully completed a pile, he had nothing further to do with it. The contractee knew what Jackson was doing, the lumber was placed upon a space allotted for the purpose to the contractee, no formal act of acceptance on its part was required, and there remained no other act or duty for the contractor to perform with respect to it, and it is not apparent why the contractor should be presumed to have the care, custody and control of a pile of lumber he had completed and left, merely because he had other lumber to place in other piles under his contract, where the contractee had had time, by the exercise of reasonable care and diligence under the circumstances, to have learned that the pile had been completed and to have observed its condition, and upon the facts of this case that was a question for the jury.

The defendant's third prayer was defective because it improperly assumed a fact, to wit, that a "sliding device" was attached to the pile of lumber.

Its "B" prayer rests upon the erroneous theory that if the appellant employed Jackson as an independent contractor to remove and pile the lumber, that it was not responsible for his negligence, and that therefore the plaintiff could not recover against the appellant.

Conceding that the appellant was not responsible for Jackson's negligence, it does not follow from that premise that it was not responsible for its own, and this prayer was properly refused, since there was some evidence in the case from which the jury might have inferred that the appellant had itself been negligent. Its "D" prayer stated somewhat more elaborately the same proposition and was subject to the same criticism, and we find that it too was properly refused.

For the error involved in granting the plaintiff's first prayer, the judgment appealed from must be reversed, and the case remanded for a new trial.

*Judgment reversed and case remanded for a new trial, with costs to the appellant.*