## OTIS ELEVATOR COMPANY *v.* LEPORE, INFANT, ETC.

[No. 304, September Term, 1961.]

*Decided June 7, 1962.*

The cause was argued before BRUNE, C. J., and PRESCOTT, HORNEY, MARBURY and SYBERT, JJ.

*Thomas G. Andrew,* with whom were *Rollins, Smalkin, Weston & Andrew* on the brief, for appellant.

*Max R. Israelson* and *Melvin J. Sykes* for appellee.

PRESCOTT, J., delivered the opinion of the Court.

This is a suit involving personal injuries sustained by "Ricky" LePore, a 3½ year old boy, when the front half of his left foot was amputated by an escalator as he was descending from the third to the second floor of a department store in Baltimore City. Suit was brought against both the store and the Otis Elevator Company, which was under contract to

inspect, maintain and service the escalator. The case was tried before Judge Byrnes and a jury, and resulted in a verdict for the plaintiff in the amount of $70,000. Otis, alone, has appealed.

The sole question presented is whether the evidence was legally sufficient to show negligence on the part of the appellant, which was a proximate cause of the accident.

Although the judgment is a substantial one, the facts are comparatively simple. Evidence was offered to the following effect. On July 30, 1958, Ricky was riding with his parents down the escalator as stated above. His mother got on first, carrying her baby, then about two months old. Ricky got on the next step behind her, and his father got on the step immediately behind Ricky, and kept his left arm on Ricky's shoulder. Ricky, wearing low-cut tennis shoes, was standing near the rail to his left as he was descending, and his left hand was on the hand rail.

As he neared the bottom of the escalator, he screamed and was turned further to his left than he had been facing. The father tossed away a package he was carrying and went around Ricky's right side to a place below the boy. The father grasped him under the arms from below and to the side but was unable to lift the child, whose foot was caught in some unknown manner. When the boy reached the second floor landing he was suddenly released, and his father was able to lift him from the escalator, and "the first thing I pulled him up I noticed part of 'his foot was missing, so I just picked him up and put my hand under. it, the missing part." The entire front half of the foot forward of the instep had been amputated.

The escalator had been installed in 1938. In 1953, Otis contracted with the department store to furnish "Otis Maintenance" on the escalators in the store. Under the contract, Otis agreed to "maintain the entire escalator equipment," to "keep this equipment properly adjusted" and to "use all reasonable care to maintain the escalators in proper operating condition." Otis does not deny that it was responsible for the maintenance, adjustment, inspection, etc., of all the parts of the escalators as far as they are adjustable.

The particular escalator here involved is a reversible one with a 15 foot ½ inch rise. It consists of steps mounted on wheels which ride a track. Each step consists of two parts: (1) a metal riser of relatively thin gauge which is normally slightly convex or bulging outwards toward a person viewing the riser from the bottom of the escalator, and (2) a step surface consisting of a steel or aluminum tread with grooves and ridges (or "teeth") giving a corrugated effect.

On both sides of the steps are large stationary structures called rails. At the lower part of this structure, extending throughout the rise of the escalator, is a metal panel which extends a short distance above each step. This panel is known as the side skirt or side skirt panel. Immediately above this panel is the second section of the rail known as the balustrade, and on the top of the balustrade is a moving rubber handrail which descends along with the passenger on the stairs.

As the steps of the escalator approach the bottom, their height decreases until the steps finally level off at the landing. At the base of the steps on the landing are two metal plates. The first is called the "comb plate," which is removable with a gridlike appearance about flush with the end of the rail. It is called a "comb plate" because of the teeth at the end of the plate at the point where the steps disappear. These teeth fit into the grooves of the treads of the steps, and "comb" out cigarette butts, trash, and similar matter which may have been dropped on the treads. The steps level off about one half tread from the comb plate and disappear under the comb plate.

The escalator in question is referred to as a "two foot" escalator, i. e., two feet wide. These two feet, however, are measured from higher up on the escalator than the steps themselves, and refer to clearance for packages, and the like; it was agreed in the testimony that the width of each step tread is exactly 17 inches. According to the manufacturer's specification, the normal clearance between the steps and each side skirt panel was .074 inches, or a little less than 5/64ths of an inch.

The American Standards Committee's American Standard Safety Code for elevators, dumbwaiters and escalators, en-

dorsed by the National Bureau of Standards, the American Institute of Architects and the American Society of Mechanical Engineers, provides that the maximum safe clearance between steps and side skirt panels is not more than 3/16ths of an inch on one side and a total of one-quarter of an inch for both sides. This is a maintenance code rather than a design code, and applies to all escalators, no matter when built.

A mechanic was assigned by Otis to inspect and service the escalator weekly; but Otis did not supply, and their maintenance man did not use, any tools or gauges to measure any clearances, and particularly the side skirt panel clearances, although it would have been quite inexpensive and practical to use "go and non-go gauges" of predetermined sizes. If these gauges can be inserted into an opening the clearance is too large, and if they cannot, the opening does not exceed permissible standards.

The mechanic who had serviced this escalator once a week since 1945 was not very familiar with it. He did not know the width of the steps; what the tires of the step wheels were made of; the permissible clearance between the side skirt and the steps; the clearance between the tread of the step and the comb plate; the distance in which the application of the brakes would stop the escalator; the dimensions of the grooves and ridges on the step treads; or whether the escalator was equipped with a rack and pall braking device.

He spent a total of four hours a week on the four escalators at the store in question. His inspections did not include inspecting each step in order to determine rock or other conditions, and when he did inspect for such defects, the inspection consisted of riding on a few steps to determine by feel whether it was satisfactory.

The plaintiff offered evidence that at the time of the injury there was a clearance from the edge of the step to the side skirt panel of one-quarter inch on each side, which was substantially uniform up and down the entire rise of the escalator. This was twice the maximum approved as safe by the American Standard Safety Code. In addition, the hazard was increased by offset on both sides of each step of one-eighth of

an inch from the edge of the step to the first ridge on the step tread, so that the actual opening between the surface of the step and the side skirt panel was three-eighths of an inch on each side, or a total of three-quarters of an inch on both sides. There was no dispute that clearances of this size were abnormal and dangerous. Mr. Calbeck, defendant's own supervisor of mechanics who repair and modernize escalators, was called as a witness by the defendant, and he testified that any side skirt clearance which exceeds a total of one-quarter of an inch for both sides "is going beyond a point of safety." The appellee's contention is that Ricky's tennis shoe and foot were caught and drawn into the clearance between the step and the side skirt, and his foot was severed when he reached the bottom.

The appellant acknowledges that clearances between the edge of the steps to the side skirt panel of the size mentioned above could constitute negligence, but bases its defense on the claim that there was no evidence that the child's foot was caught in any such clearance. This claim stems primarily from the fact that no witness actually saw and testified to the exact spot where Ricky's foot was caught and injured. Stated differently, the appellant contends that even if it be assumed that the large clearance between the step and the skirt panel amounted to negligence, it cannot be held liable for such negligence unless the plaintiff showed that said negligence proximately caused the injuries complained of. It advances the theory that the child's foot may have been caught and injured at some point on the escalator where the clearance was not greater than that recognized and approved by all sources.

If we assume that appellant's above statement of the law is correct, it does not follow that the matter of causation has to be proved by direct and positive proof to an absolute certainty. It would serve no useful purpose to set forth all of the plaintiff's testimony in minute detail. Suffice it to say that there was ample circumstantial evidence to support a rational inference by the triers of fact that the child's foot was caught and injured in the clearance between the step and the side skirt panel. Reasonable probability is the usual *quantum* of

58

proof required to establish causation. *Prosser, Torts* (2nd ed.), § 44, sets forth the true test concerning the legal sufficiency of evidence on this point as follows:

"Plaintiff is not, however, required to . . . negative entirely the possibility that the defendant's conduct was not a cause, and it is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would have occurred if the defendant had acted otherwise. Proof of what we call the relation of cause and effect, that of necessary antecedent and inevitable consequence, can be nothing more than 'the projection of our habit of expecting certain consequents to follow certain antecedents merely because we had observed these sequences on previous occasions'. If as a matter of ordinary experience a particular act or omission might be expected, under the circumstances, to produce a particular result, and that result in fact has followed, the conclusion may be permissible that the causal relation exists.

"Circumstantial evidence or common knowledge may provide a basis from which the causal sequence may be inferred [from the existence of a condition which] 'greatly multiplies the chances of accident, and is of a character naturally leading to its occurrence' . . . When a child is drowned in a swimming pool, no one can say with certainty that a life guard would have saved him; but the experience of the community permits the conclusion that the absence of the guard played a significant part in the drowning. Such questions are peculiarly for the jury; and whether proper construction of a building would have withstood an earthquake, or whether reasonable police precautions would have prevented a boy from shooting the plaintiff in the eye with an airgun, are

questions on which a court can seldom rule as a matter of law."

See also *Hecht Co. v. Jacobsen,* 180 F. 2d 13 (U. S. C. A., D. C.) ; *State of Maryland v. Manor Real Estate & Trust Co.,* 176 F. 2d 414 (C. A. 4th) ; *Aleshire v. State,* 225 Md. 355, 170 A. 2d 758, and authorities cited therein.

That appellant's contention was considered by the jury and decided in favor of the appellee is quite clearly shown by the following passage from the trial judge's instructions:

"You are instructed as a matter of law, that the burden is upon the plaintiff to prove by a preponderance of the evidence that Ricky LePore's shoe and foot became caught between the side of the step and the skirt, and further that the shoe and foot were so caught because of negligence on the part of the defendant, and if you find that the plaintiff has not met the burden of proving that his shoe and foot were caught between the side of the step and the skirt and that it was so caught because of the negligence of the defendant, then your verdict should be in favor of the defendants."

*Judgment affirmed, with costs.*