WASHINGTON SUBURBAN SANITARY COM-
MISSION ET AL. *v.* GRADY DEVELOP-
MENT CORPORATION

[No. 1178, September Term, 1976.]

*Decided September 14, 1977.*

304

The cause was argued before MORTON, MENCHINE and MELVIN, JJ.

*Albert D. Brault*, with whom were *Brault, Graham, Scott & Brault* on the brief, for appellants.

*James P. Salmon*, with whom were *Sasscer, Clagett, Channing & Bucher* on the brief, for appellee.

MENCHINE, J., delivered the opinion of the Court.

A jury in the Circuit Court for Prince George's County awarded Robert K. Boyer and Sandra L. Boyer (Boyers) damages in the sum of Fifteen Thousand Dollars against Grady Development Corporation (Grady) and Washington Suburban Sanitary Commission (WSSC). The action, grounded upon the alleged negligence [1] of both Grady and WSSC, had been submitted to the jury as to Grady after reservation of decision upon motion for directed verdict. Maryland Rule 552 c.

The issue as to the negligence *vel non* of Grady came to hearing after verdict pursuant to the self-executing provisions of Maryland Rule 563 a.2. The trial court granted judgment N.O.V. as to Grady; extended judgment in favor of the Boyers against WSSC; and entered judgment in favor of Grady against WSSC in the latter's cross-claim. The Boyers and WSSC entered appeals to this Court.

The following quotation from the brief of WSSC shows the subsequent events in the trial court that have narrowed the issues requiring our consideration:

> "WSSC thereafter paid the entire judgment and obtained satisfaction from the Boyers who then dismissed their cross-appeal. At the same time,

---

1. The action had included counts for fraud and breach of warranty against Grady. Those counts, however, had resulted in judgments in favor of Grady following the grant of motions for directed verdicts and are in no way involved in this appeal.

WSSC dismissed its appeal from the judgment in favor of the Boyers.

"The matter before the Court is on the propriety of the judgments entered in favor of Grady by directed verdict on the original claims (Judgment N.O.V.) and judgment by the Court on the Cross-Claim."

Otherwise stated, liability of WSSC to the Boyers is not disputed, this appeal involving only determination of whether the evidence was legally sufficient to show (a) that Grady was jointly liable with WSSC (as the jury found) or (b) whether the evidence required indemnification of WSSC by Grady under the cross-claim.

### Conceded Facts

In September 1974, the Boyers moved into a new dwelling purchased from Grady, its builder, on Branchview Drive in a development known as "Tor-Bryan Estates" in the Oxon Hill area of Prince George's County.

On December 1, 1974, a day of very heavy rainfall, the Boyers at 8 p.m. returned to their home from a day spent with relatives. Mr. Boyer vividly described what confronted him:

"And as we entered the house — my wife, as I recall, entered ahead of me — and as I entered the threshold of the door coming in from our garage I thought I heard a strong gushing sound.

And I said to my wife, 'What is the smell?'

And by that time she had reached the stairway. And she screamed out, you know, 'Bob, the basement.'

And I rushed to the head of the stairwell, and I saw down, ebbing up against the bottom step this dark, muddy, smelly water.... It apparently knocked off the tank on top of the toilet. I tried to, you know, pull the toilet lid down, and it kept knocking it back up in my face.... I don't know

306

how long it had been going on when we got there, but it had already inundated one, two, three rooms at that end of the house, and was going down towards the main hall, in through the main hall into the recreation room, into the laundry room area, but it did continue for about three hours."

Damage to the dwelling and its contents was extensive.

At about midnight on the day of the incident, employees of WSSC undertook an investigation of the reason for the sewer back-up. After opening a manhole "at the bottom of the hill" and observing that "it was running," investigators "went back up here closer to the home and found this one backed-up." An investigator said:

"The thing was all the rain water had got in up here, these manholes, because they wasn't sealed on right. You could stand and watch the water run into it. And when a manhole is full of water and just filling like this, and your manhole down here, downstream, is running just as hard as it could run with a flow of water, you know there had to be some kind of obstruction in here to hold this water up within this manhole with the surcharge.

So, we took our wooden rods, three and a half feet long, and a cutter, and went down here where we could get in the manhole, and I put a man in there to push rods upstream to try to relieve whatever this blockage was in this line. And all we found was just the bottom of the pipe was just full of gravel, like two or three inches of gravel. And they pushed just as far as they could push the rod. That is a pretty long stream for a man to push by hand.

Q   How many rods did you get in there and push?
A   Forty-nine.
Q   Forty-nine rods?
A   Yes, sir.

Q At three and a half feet per rod?

A Right."

The sanitary sewer line serving the Boyer dwelling was eight inches in diameter but the investigator noted two or three inches of gravel within it, acting "like a creekbed," and "restricting it." The investigator added that "the line was put in like to carry the sewage away from these homes, this development, and that eight inches was supposed to be sufficient enough to carry that; but once you get the rain water in there it wasn't designed for that, to carry all that water. . . . there is only one way for the water to go, to try to relieve the weight of the water from this manhole surcharging, is to run up this sewer system and go back into this house, and if they have got any kind of outlet in their basement it is going to come up out of there."

The sewer system had been installed by contractors engaged by WSSC for that purpose, beneath the platted lines of streets already dedicated to public use by the developer as public streets. That work was done, of course, before the streets were graded and paved so that the contractors were working in open ground. During installation manhole structures designed to provide access to the sewer system were left in such manner that they projected above the proposed but unimproved roadbed to a height of eight to ten inches or more. These were constructed of brick, mortar and concrete with metal rings and tops. After the sewer line was installed, WSSC inspected the same and released the ground to the developer for installation of other utilities such as storm drains, curbs and gutters; and the grading and paving of street beds.

The sanitary sewer system was designed to be sealed to prevent the admission of surface water. Yet, water in great volume and carrying debris had entered the system through breaks in manhole installations along its course. It is uncontradicted that numerous manhole structures had been damaged by extraneous forces. The nature of and the responsibility for such extraneous forces are disputed.

## The Factual Dispute

We reiterate that in the posture in which this case reaches this Court, the liability of WSSC to the Boyers was established below and is not an issue here. The disputed issues concern WSSC and Grady, *inter sese.*

WSSC contends that agents, servants and employees of Grady damaged the manhole structures while negligently using heavy equipment in the grading or paving of streets.

Grady offers a dual answer to the WSSC contention, namely: (a) that although there is a *possibility* that the use of heavy equipment *may* have caused the damage, the evidence does not rise above guess or conjecture, and (b) that in any case the grading and paving of streets was done by independent contractors for whose negligence Grady would not be accountable.

## Grading and/or Paving As Causative

Grady urges that the record demonstrates that other wholly distinct and unrelated causative factors were equally likely to have produced the harm complained of. Grady cites operators of automobiles, trucks, installers of public utilities and "many, many, independent contractors and personnel" entering the project daily. Defective installation of the sewer system or its improper maintenance is suggested also as equally likely to have been the cause of the harm.

We reject this contention of Grady. We acknowledge that the record indicates that there is a possibility that damage to the manhole structures may have been produced by factors other than the careless use of street grading or paving equipment. We are persuaded, however, from our examination of the record as a whole, that the issue of causation was a matter for the jury within the rule discussed in *Otis Elevator Co. v. LePore,* 229 Md. 52, 181 A. 2d 659 (1962), wherein the Court of Appeals after pointing out that "Reasonable probability is the usual *quantum* of proof required to establish causation," (pp. 57-58 [662])

adopted the following language from *Prosser, Torts* (2nd ed.), § 44:

"'Plaintiff is not, however, required to ... negative entirely the possibility that the defendant's conduct was not a cause, and it is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would have occurred if the defendant had acted otherwise. Proof of what we call the relation of cause and effect, that of necessary antecedent and inevitable consequence, can be nothing more than "the projection of our habit of expecting certain consequents to follow certain antecedents merely because we had observed these sequences on previous occasions". If as a matter of ordinary experience a particular act or omission might be expected, under the circumstances, to produce a particular result, and that result in fact has followed, the conclusion may be permissible that the causal relation exists.

"'Circumstantial evidence or common knowledge may provide a basis from which the causal sequence may be inferred [from the existence of a condition which] "greatly multiplies the chances of accident, and is of a character naturally leading to its occurrence" .... When a child is drowned in a swimming pool, no one can say with certainty that a life guard would have saved him; but the experience of the community permits the conclusion that the absence of the guard played a significant part in the drowning. Such questions are peculiarly for the jury; and whether proper construction of a building would have withstood an earthquake, or

whether reasonable police precautions would have prevented a boy from shooting the plaintiff in the eye with an airgun, are questions on which a court can seldom rule as a matter of law.' " 229 Md. at 58-59, 181 A. 2d at 662.

*See also: Peterson v. Underwood,* 258 Md. 9, 17, 264 A. 2d 851, 855 (1970); *Unsat. C. & J. Fund Bd. v. Bowles,* 25 Md. App. 558, 561 *et seq.,* 334 A. 2d 532, 535 *et seq.* (1975).

We think that the nature and extent of the damage to the manhole structures, coupled with the circumstance that numerous such structures sustained damage, reasonably would permit a jury to conclude that it is more probable than not that negligent use of grading or paving equipment was the causative agency for the harm to the Boyers. A jury question was presented upon the issue of causation.

### *Grady Responsibility*

The initial question whether Grady is responsible under the doctrine of *respondeat superior* is easily answered in the negative. We shall say no more than that the uncontradicted evidence establishes that all grading and paving of streets was done by independent contractors, wholly without retention by Grady of any control upon their performance.

In *Hoerr v. Hanline,* 219 Md. 413, 420-21, 149 A. 2d 378, 381 (1959), it was said:

"All of the authorities agree that the rule of *respondeat superior,* which requires one person to answer for the acts of another, arises from the relation of principal and subordinate. It only applies when the relation of master and servant, employer and employee or principal and agent is shown to exist between the wrongdoer and the person sought to be charged for the result of the wrong. It does not apply when the wrongdoer is an independent contractor, even though there be an agreement or 'arrangement' between him and the person who is claimed to be responsible for the wrong."

Determination of that initial question is not, however, dispositive of the question of Grady's responsibility. This is so because there are exceptions to the application of the rule of employer non-liability for the negligence of independent contractors. The Court of Appeals put it this way in *Samson Construction Co. v. Brusowankin*, 218 Md. 458, 464, 147 A. 2d 430, 434 (1958):

> "The cases make it plain that the mere employment of an independent contractor will not always relieve the principal from liability for damage done by the contractor."

Indeed, the rule of non-liability has been declared to have such myriad exceptions that its continued viability as a general principle of law has become suspect.

Prosser, *Law of Torts*, Ch. 12, § 71, at 468 (4th Ed., HB, 1971) puts it thus:

> ". . . the prediction has been made that ultimately the 'general rule' will be that the employer is liable for the negligence of an independent contractor, and that he will be excused only in a limited group of cases where he is not in a position to select a responsible contractor, or the risk of any harm to others from the enterprise is obviously slight. The English courts have taken steps in this direction, until the position of the ordinary independent contractor in England approaches that of a servant. The American courts, have not gone so far, and have continued to repeat the 'general rule' of non-liability with exceptions, whose very number is sufficient to cast doubt upon the validity of the rule."

WSSC contends that even if the grading and paving of streets was accomplished through independent contractors, liability still would attach to Grady for the negligent performance of such work for any of the following reasons:

1. Grady's obligation was non-delegable.
2. The work was inherently dangerous.

   3.   The injury was caused by the thing contracted to be done, not by collateral negligence.

The contentions above are interrelated and will be considered together. The interrelationship of the several WSSC contentions and the continuing erosion of the general rule of employer non-liability for the negligence of independent contractors is thoughtfully posited in Prosser, *Law of Torts*, Ch. 12, § 71 (4th Ed., HB, 1971), Imputed Negligence; Independent Contractors:

> *"Non-delegable Duty*
>
> A different approach, adopted in several of the exceptions to the general rule of non-liability, has been to hold that the employer's enterprise, and his relation to the plaintiff, are such as to impose upon him a duty which cannot be delegated to the contractor. It has been mentioned earlier that there are numerous situations in which it may be negligence to rely upon another person, and the defendant is not relieved of the obligation of taking reasonable precautions himself. But the cases of 'non-delegable duty' go further, and hold the employer liable for the negligence of the contractor, although he has himself done everything that could reasonably be required of him. They are thus cases of vicarious liability.
>
>        \* \* \*
>
> It is difficult to suggest any criterion by which the non-delegable character of such duties may be determined, other than the conclusion of the courts that the responsibility is so important to the community that the employer should not be permitted to transfer it to another. So far as they may be willing to broaden the category in the future, the law may approach an ultimate rule that any duty which can be found to rest upon the employer himself cannot be delegated to an independent contractor." at pages 470-72.

## " 'Inherently Dangerous' Activities

The leading English case of Bower v. Peate, in which the foundation of the plaintiff's building was undermined by an excavation, adopted still another approach, saying that the employer would be liable for the negligence of the contractor if, in the course of the work, injurious consequences might be expected to result 'unless means are taken to prevent them.' This gave rise to an exceptional category of work likely to be peculiarly dangerous 'unless special precautions are taken.' American courts on the whole have preferred to adopt the language of Judge Dillon as to work which is 'inherently dangerous.' Neither phrase has ever yet been very well defined by anyone, and they are apparently intended to mean very much the same thing. They have been used more or less interchangeably by the courts, which usually state and rely upon both as the basis of an exceptional rule. If there is a distinction, it is that the 'special precautions' exception is more commonly applied where the employer should anticipate the need for some one specific precaution, such as a railing around an excavation in the sidewalk while 'inherent danger' is used where the work calls for a whole set of precautions, against a number of hazards, as in the case of painting carried on upon a scaffold above a highway.

\* \* \*

But liability on either basis has been extended beyond this, to work which, in its nature, will create some peculiar risk of injury to others unless special precautions are taken — as, for example, excavations in or near a public highway, or construction or repair work on buildings adjoining it or likely to obstruct it, and similar activities, such as the clearing of land by fire, tearing down

high walls or chimneys, the construction of a dam, and many other kinds of work.

So far as the cases indicate the principle seems to be limited to work in which there is a high degree of risk in relation to the particular surroundings, or some rather specific risk or set of risks to those in the vicinity, recognizable in advance as calling for definite precautions. The emphasis is upon the 'peculiar' character of the risk, and the need for special, unusual care." at pages 472-73.

### " 'Collateral' Negligence

Another distinction, as yet not very exactly defined, is the rule generally accepted, that the employer is liable only for risks inherent in the work itself, and not for 'collateral' or 'casual' negligence on the part of the contractor. . . . It is very closely related to the exception as to 'inherent danger,' and seems in reality to represent nothing more than a negative statement of it, describing the type of situation in which the special danger is not necessarily involved in the work to be done, and not contemplated in connection with the way it is expected to be done.

\* \* \*

The test of 'collateral' negligence, therefore, appears to be, not its character as a minor incident or operative detail of the work to be done, but rather its disassociation from any inherent or contemplated special risk which may be expected to be created by the work. The employer is not liable because the negligence is 'collateral' to the risk created — which is to say, that the performance of the work contracted for in the normal manner contemplated by the contract would involve no expectation of such a risk of harm to the plaintiff, and it is the abnormal departure from usual or contemplated methods by the servants of the

contractor which has created the danger. Where the peculiar risk is involved in the work to be done itself, as where a sign is to be painted over the sidewalk, the fact that the risk which was to be expected materializes through the incidental negligence of the servant in dropping the bucket will not relieve the employer of liability. But where the employer reasonably expects that windows will be painted in place on the building, and the contractor decides to remove them and in the process drops one five floors, the negligence is collateral to the risk." at pages 474-75.

The several theories of Grady liability advanced by WSSC have been the subject of consideration and discussion in numerous Maryland cases.

In *P., B. & W. R. Co. v. Mitchell,* 107 Md. 600, 69 A. 422 (1908), it was said:

"The question of the extent to which the employment of an independent contractor to do work, placed entirely under his control, will relieve the employer from liability for injuries resulting to third persons has not only been much discussed by other tribunals but has been fully considered, in the light of the authorities applicable to it, and passed upon by this Court in a number of cases, among which are *Deford v. State, use of Keyser,* 30 Md. 179;[2] *City & Suburban R. R. Co. v. Moores,* 80 Md.

---

2. In the cited case of Deford v. State, use of Keyser, 30 Md. 179 (1869), the Court of Appeals had quoted with approval the following language of Baron Wilde in the English case of Hole v. R.R. Co., 6 Hurl. & Nor. 488:

"'... when the thing contracted to be done causes the mischief, and the injury can only be said to arise from the authority of the employer, because the thing contracted to be done is imperfectly performed, there the employer must be taken to have authorized the act, and is responsible for it. The present defendants were authorized to take land for the purpose of their railway, and to build a bridge over the Swale. Instead of erecting the bridge themselves, they employed another person to do it. What was done was done under their authority. In the course of executing their order, the contractor, by doing the work imperfectly, obstructed the navigation. It is the same as if they had done it themselves. It is not distinguishable from the case

348; *Bonaparte v. Wiseman,* 89 Md. 12, and *Samuel v. Novak,* 99 Md. 558. As a result of these cases it may now be said to be settled in this State that although, when the work is being done by an independent contractor the employer will not be liable for an injury caused by negligence in a matter collateral to the contract, *he will be liable if the injury be caused by the thing contracted to be done, or if it be such as might have been anticipated by him, as a probable consequence of the work let out to the contractor, and he took no precaution to prevent it. The principle thus broadly stated embraces the subordinate proposition, separately discussed in many cases and especially appropriate to the one now before us, that the duty to refrain from interfering with the right of the public to the safe and unimpeded use of highways and streets is one of which an employer cannot divest himself by committing work to a contractor."* (Emphasis added.) 107 Md. at 606, 69 A. at 424.

In *Pierson v. Gohr,* 126 Md. 385, 399, 94 A. 1021, 1025 (1915), it was said:

"Giving full effect to the doctrine of independent contractor, *an important question in this case is whether the appellants did not owe a duty to the appellee to protect him from the results of such negligence of an employee of Brown as caused this injury,* and we cannot say they did not, under the facts disclosed by the record, nor could the Court say, as a matter of law, he performed that duty, and take the case from the jury. It would not do to say that a general contractor, who has charge of a building, and who does some of the work himself, and contracts with others to do other parts of it in and about the building, owes no duty to an

where a land owner orders a person to erect a building upon his land which causes a nuisance. The person who ordered the structure to be put up is liable, and it is no answer for him to say that he ordered it to be put up in a different form.' " 30 Md. at 206.

employee of a subcontractor to see that the employees of another such contractor do not by their negligence injure him, if the injury is such as might have been anticipated by the contractor, and he could by reasonable precautions have protected him and others rightfully there." (Emphasis added.)

In *Surry Lumber Co. v. Zissett,* 150 Md. 494, 507, 133 A. 458, 463 (1926), it was said:

"There is a class of cases, in which the thing to be done is of such a character that the defendant, in an action to recover damages for injuries resulting therefrom, *is bound to anticipate that such injuries may naturally result from it, or where the mere doing of the work involves the violation of a duty, to which the defence of independent contractor is not applicable.*" (Emphasis added).

In *City & S. Ry. Co. v. Moores,* 80 Md. 348, 353-54, 30 A. 643, 644 (1894), it was said:

"The general principles applicable to a case where work is to be done by a contractor, upon his own responsibility, who is not subject to the control of the employer as to the manner in which it is to be performed, are so familiar and well-established that it would be useless to go into any extended discussion of them. The difficulty generally is to determine who is to be regarded as the master of the wrongdoer under the facts arising in the particular case before the Court, and whether there is any such relation existing between the person for whom the work is to be done and the negligent party, as to hold the former responsible by third persons through such negligence. Even if the relation of principal and agent, or master and servant, do not, strictly speaking, exist, yet the person for whom the work is done may still be liable *if the injury is such as might have been*

*anticipated by him, as a probable consequence of
the work let out to the contractor,* or if it be of such
character as must result in creating a nuisance, *or
if he owes a duty to third persons or the public in
the execution of the work."* (Emphasis added.)

*See also Bonaparte v. Wiseman,* 89 Md. 12, 21-22, 42 A.
918, 919 (1899), wherein it was said:

"In the case of the *Ohio Southern R. R. Co. v.
Morey,* 47 Ohio St. 207, the Court say: 'One who
causes work to be done is not liable ordinarily for
injuries that result from carelessness in its
performance by the employee of an independent
contractor to whom he has left the work without
reserving for himself any control of an execution of
it. But this principle has no application where the
resulting injury instead of being collateral and
following from the negligent act of the employee
alone, is one that might have been anticipated as a
direct or probable consequence of the performance
of the work contracted for, if reasonable care is
omitted in the course of its performance. In such
case the person causing the work to be done will be
liable, though the negligence is that of any
employee of an independent contractor.' In the
same case, at p. 214, the Court say: 'It is equally
clear that the law devolves upon every one about to
cause something to be done which will probably be
injurious to third persons, the duty of providing
that reasonable care shall be taken to obviate its
probable consequences.' "

Although the subject case does not fall into any neat
pattern of employer liability, we find the facts and
circumstances shown in this record to be such as present a
jury question whether vicarious liability attached to Grady.

We are persuaded that a synthesis of these cited Maryland
cases demonstrates that the principles stated in *Prosser,
supra,* long have been recognized as the law of this State. It

is plain, in short, that Maryland Courts long have recognized that a searching examination of the facts and circumstances of the particular case must be made before non-liability of an employer for the negligence of his independent contractor will be declared as a matter of law.

In the subject case there was evidence tending to show that the projecting sanitary sewer structures would be subject to damage if struck by heavy grading or paving equipment and that such damage likely would destroy the integrity of an essential requirement of the system, *i.e.*, that surface water be denied entry to it. Thus there was great risk of harm if the street paving work was negligently performed. *See Prosser, supra,* at 468, 473; *P., B. & W. R. Co. v. Mitchell, supra;* footnote 2, *supra.*

There can be no doubt that the public health and safety is placed in jeopardy whenever a sanitary sewer system's imperviousness to surface water is destroyed. We hold that when an enterprise is undertaken the performance of which poses a high potential for harm to such a system, a duty to the public to guard against the danger arises. We think such duty "is one of which an employer cannot divest himself by committing work to a contractor." *P., B. & W. R. Co. v. Mitchell, supra,* at 606 [424].

Where, as here, the risk of such harm is involved in carrying out the work to be done under the contract, ensuing negligence cannot be deemed collateral to its performance. *Prosser, supra,* at 475. The employer "is bound to anticipate that such injuries may naturally result", *Surry Lumber Co. v. Zissett, supra,* at 507 [463], particularly, "if he owes a duty to third persons or the public in the execution of the work." *City & S. Ry. Co. v. Moores, supra,* at 354 [644]. We think such a duty was owed.

Grady's motion for a directed verdict should have been denied. Judgment N.O.V. in favor of Grady was erroneously entered.

### Cross-Claim of WSSC

The cross-claim of WSSC had sought indemnification [3] in the event of a recovery by the plaintiff because "such damages were the result of the concurring negligence of the defendant, Grady Development Corporation and that Grady's concurring negligence was active and primary and any negligence on the part of this defendant was passive and secondary."

The trial court's charge to the jury upon the issue of WSSC liability was clear and concise. It controls our decision upon the question of indemnification. It was as follows:

"In this case I instruct you as a matter of law, first, concerning the Washington Suburban Sanitary Commission, that the Washington Suburban Sanitary Commission was under a duty to properly inspect and maintain its sewer system that was located in the development that the Boyers lived. They had designed this sewer system, and as a consequence they took control over it in 1973, and it was upon them to reasonably inspect it and reasonably maintain it, and if a defect existed in this system they were required to fix it. However, if such a defect existed in the system they first must be given some kind of notice of such defect, and this notice can be given to them either actually or by what we call constructive notice, and after notice of some sort, whether actual or constructive, they did not properly repair the defect after it came to their notice then your verdict would be for the plaintiff, and after full and fair consideration if you are convinced by a preponderance of the evidence that the defendant Washington Suburban Sanitary Commission failed to act as reasonable people in the operation and maintenance of their sewer system your verdict

---

**3.** The cross-claim also sought contribution, to which under the circumstances of this case WSSC is entitled.

would be for the plaintiff. If, however, you are not convinced by a preponderance of the evidence or the evidence that has been produced here on the part of the plaintiffs that they are entitled to recover, then your verdict accordingly would be for the defendant."

It will be noted that the jury specifically was instructed that liability would not attach to WSSC unless it had actual or constructive notice that a defect in the system existed that it had failed to repair in accordance with its affirmative duty to do so. The verdict of the jury against WSSC thus established the breach by it of an affirmative duty. No appeal was perfected by WSSC from the judgment entered upon that verdict.

There is, accordingly, no basis for a finding that the negligence of WSSC was passive and secondary. Its liability was not vicarious. *Compare Pennsylvania Threshermen & Farmers' Mutual Casualty Insurance Company v. Travelers Insurance Co.,* 233 Md. 205, 196 A. 2d 76 (1963).

> *Judgment N.O.V. in favor of Grady reversed and case remanded for entry of judgment in accordance with the jury's verdict.*
>
> *Judgment on cross-claim affirmed as to indemnity, reversed as to contribution.*
>
> *One-half of the costs to be paid by appellant; one-half to be paid by appellee.*