707 A.2d 850

John W. LYON, et al.

v.

Larry A. CAMPBELL, et al.

No. 151, Sept. Term, 1997.

Court of Special Appeals of Maryland.

April 1, 1998.

414

Melvin J. Sykes, Baltimore (Reuben A. Guttman, of counsel and Provost & Umphery, Washington, DC, on the brief), for appellants.

Bruce L. Marcus (Marcus & Bonsib, Greenbelt, Judah Lifschitz, Randall W. Wax, Shapiro, Lifschitz and Schram,

P.C., Washington, DC, Arnold M. Weiner, Thomas J. Zagami and Weiner, Astrachan, Gunst, Hillman & Allen, Baltimore, on the brief), for appellees.

Argued before WENNER and BYRNES, JJ., and PAUL E. ALPERT, Judge (retired), Specially Assigned.

BYRNES, Judge.

From May 1 to August 2, 1996, the following separate but related cases were tried seriately, before one jury, in the Circuit Court for Prince George's County: *MQIL v. Lyon, et al.; Lyon, et al. v. Campbell, et al.;* and *Campbell v. Lyon.*[1] The judgments in *MQIL v. Lyon* and *Lyon v. Campbell* are now before us on appeal.

In *MQIL v. Lyon,* the jury found that appellant John W. Lyon ("Lyon") tortiously interfered with the Moler Lease Option and the Broyhill Assignment Agreement, both of which would have benefitted Millville Quarry, Inc. ("MQI") had they been exercised and consummated. The jury also found that Lyon breached a fiduciary duty to MQI. It awarded compensatory and punitive damages to appellee MQI Liquidating Corporation ("MQIL"), the assignee of MQI. On appeal, Lyon presents four questions for review, which we have rephrased slightly:

 I. Did MQIL fail as a matter of law to make a submissible case that any allegedly wrongful conduct of Lyon proximately caused the injury alleged by MQIL?

 II. Was MQIL's evidence of Lyon's alleged misrepresentation insufficient as a matter of law to support a finding that the alleged misrepresentation was made?

 III. Was the evidence insufficient as a matter of law to establish that Lyon owed Campbell or MQI a fiduciary obligation and that he breached that obligation?

 IV. Was the award of punitive damages plain error?

---

**1.** For the sake of clarity, throughout this opinion we refer to these cases as they were styled in the circuit court.

We answer "yes" to Questions I, II, and III. Accordingly, we reverse the judgment in *MQIL v. Lyon.* We do not reach Question IV.

In *Lyon, et al. v. Campbell, et al.*, the jury found that John W. Lyon, Eleanor Lyon, and Ronald Williams, as beneficiaries and Trustees of the Cub Trust, lacked standing to sue appellees Larry Campbell, Yvonne Campbell, Robert Jenkins, Barry Strohm, Edward Storke, and Joan Campbell–Alger in their capacities as shareholders, officers, and directors of MQI and MQIL, for fraud, wrongful conversion, civil conspiracy, and breach of fiduciary duties. On appeal, Lyon presents one question for review:

I. Did the trial court err in submitting the issue of standing to the jury and failing to rule that Lyon had standing to sue and was entitled to an accounting to determine the damages for Campbell's wrongful conversion and breach of fiduciary obligation?

We hold that any error committed by the court in submitting the issue of standing to the jury was harmless and that Lyon's request for an accounting was rendered moot by the verdict. Accordingly, we affirm the judgment in *Lyon, et al. v. Campbell, et al.*

## FACTS

### *MQIL v. Lyon* [2]

This case arose out of the ashes of the failed business dealings between John W. Lyon and Larry A. Campbell ("Campbell"). Lyon and Campbell met in 1967, when Campbell performed excavation work for a construction project that Lyon was overseeing. Soon thereafter, Lyon became a co-owner with Campbell in Excavation Construction, Inc. ("EC"), a construction enterprise doing business in the Washington, D.C. metropolitan area. In the 1970s, Lyon and Campbell formed ICE, Inc. ("ICE"), a holding company that owned

---

**2.** The facts are set forth in the light most favorable to MQIL, the party that prevailed below. *See* Md. Rule 8–131(c).

several subsidiary construction companies, including EC. Lyon and Campbell were each fifty percent stockholders in ICE.

In the late 1970s, EC fell upon hard times. Eventually, it went bankrupt. Lyon and Campbell had executed personal guarantees of certain bank loans extended to EC. Dominic F. Antonelli ("Antonelli"), a long-time friend and business associate of Lyon, purchased the notes on which Campbell and Lyon were personally liable, to save them from financial ruin.

In October 1980, Lyon and Campbell formed MQI for the purpose of mining and hauling limestone and gravel. MQI was operated as a closely held corporation. At first, Lyon and Campbell each owned forty percent of MQI's stock and Manus (Mike) Perkins, MQI's president, owned the remaining twenty percent. In 1984, Lyon and Campbell relinquished 2% of their stock, and Perkins relinquished 1% of his stock. That stock was then transferred to four employees of MQI: Barry R. Strohm, Robert P. Jenkins, Edward W. Storke, and Donald L. Davidson. After the stock transfer, Lyon and Campbell each owned a thirty-two percent interest in MQI, Perkins owned a sixteen percent interest in MQI, and Strohm, Jenkins and Davidson each owned a five percent interest. Lyon, Campbell, and Perkins each transferred his stock in MQI to a voting trust: Lyon to the Cub Trust; Campbell to the Joan Trust; and Perkins to the Perkins Family Trust.

Soon after it was incorporated, MQI entered into negotiations with U.S. Steel to purchase a vacant limestone quarry in Millville, West Virginia. The "Moler Limestone Quarry" consisted of approximately 290 acres of real property owned in fee simple by U.S. Steel and approximately 287 contiguous acres, in which U.S. Steel held a leasehold interest. By 1984, the opportunity was ripe for MQI to purchase the quarry. Unfortunately, MQI lacked the financial resources to do so; moreover, it needed to obtain funding, in the form of an Industrial Revenue Bond, to finance acquisition of equipment and other assets necessary to operate the quarry. Lyon and Campbell approached Antonelli for assistance. Antonelli agreed to provide the financial backing that MQI needed.

In September, 1984, Antonelli purchased the Moler Limestone Quarry for $940,987.00. On the same day, MQI and Antonelli entered into a royalty agreement (the "Moler Lease"), by which Antonelli allowed MQI to mine the Moler Limestone Quarry in exchange for MQI paying monthly royalties calculated on the tonnage of limestone mined. The Moler Lease granted MQI an exclusive option to purchase the Moler Limestone Quarry from Antonelli during the first ten years of the lease term. A side agreement between MQI and Antonelli established that, until August 31, 1989, the option purchase price would be equal to Antonelli's cost of acquisition ($940,-987.00). Thereafter, the option purchase price would increase to Antonelli's acquisition cost plus $2 million dollars ($2,940,-987.00). The terms of the Moler Lease required MQI to exercise its purchase option "by written notification to [Antonelli] at least ninety (90) days prior to the date of purchase."

In May, 1985, Suburban Bank, which later became Sovran Bank of Maryland ("Sovran Maryland"), extended a $1 million dollar revolving line of credit to MQI, secured by MQI's accounts receivable. This line of credit, also known as a "loan facility," was personally guaranteed by Lyon, Campbell, and Perkins. David Nelson of Sovran Maryland was the loan officer assigned to the loan facility account. At about the same time, Sovran Maryland extended a $750,000.00 signature loan to MQI. Lyon, Campbell, and Antonelli personally guaranteed that loan. Joseph Cassidy of Sovran Maryland was the loan officer assigned to the signature loan account. All told, Lyon and Campbell each were potentially personally liable for $1,750,000.00, the full amount of the Sovran Maryland loans guaranteed by them.

In the mid–1980s, tensions developed between Lyon and Campbell due, in part, to a dispute over certain actions taken by Perkins and other disagreements about MQI's business operations. By late–1986, the relationship between Lyon and Campbell had grown increasingly antagonistic. Each desired to discontinue his business ventures with the other. Lyon wanted to do so by selling MQI. On June 6, 1986, he wrote to Campbell, proposing that MQI be sold and that the issue of

the sale of MQI be presented to the shareholders for discussion. Campbell responded by making it known that he was against selling MQI and that he was "strongly opposed to taking any action whatsoever which would suggest to anyone that MQI might be for sale." The strife between Lyon and Campbell led Antonelli to conclude that he should take steps to dispose of his financial interest in the quarry and to otherwise remove himself from his position as financial backer to MQI. In July, 1986, Lyon and Antonelli each informed Campbell and the other MQI shareholders that they desired to sell or dispose of their respective interests and positions.

The relationship between Lyon and Campbell continued to erode over the next two years. Lyon remained intent upon selling MQI. Campbell and the other MQI shareholders remained opposed to a sale. Campbell limited Lyon's access to MQI's financial records out of concern that Lyon was disclosing proprietary information of the company to competitors in his effort to attract a purchaser for the company or his interest in the company.

By 1988, Lyon and Campbell were no longer on speaking terms. Early that year, MQI was negotiating with Sovran Maryland to increase its $1 million dollar loan facility to $3 million dollars. On March 15, 1988, Lyon wrote to David Nelson stating that he would not execute a personal guarantee of a new $3 million dollar loan facility unless all of the MQI stockholders signed personal guarantees for the increased amount also. As they would not do so, the loan was not increased.

Beginning in mid–1988, negotiations began in earnest to settle the disputes between Lyon and Campbell and to determine the direction of MQI. At Lyon's suggestion, Antonelli represented Lyon in these negotiations and Joel T. Broyhill, a friend and business associate of Campbell, represented Campbell. The negotiations continued through 1988 and into the summer of 1989. Although Lyon maintained that the negotiations initially concerned a buy-out of his and Antonelli's interests in MQI and that, by mid–1989, when a buy-out of Anto-

nelli's position only was being discussed, Antonelli was no longer negotiating on his behalf, there was ample evidence from which the jury could conclude that Antonelli continued to negotiate not only on his own behalf but also on behalf of Lyon.

On June 16, 1989, after the expiration of MQI's ninety-day notice period for exercising the Moler Lease Option to avoid paying the $2 million dollar penalty, Campbell wrote to Antonelli stating that MQI intended "to exercise its option in the [Moler] Lease Agreement to take [Antonelli] out [of MQI] before August 31, 1989." Antonelli responded on June 21, 1989, stating that he would allow MQI to exercise its purchase option without paying the $2 million dollar penalty on the following conditions: (1) that "[t]he transaction [would be] implemented before the close of business on August 31, 1989," (2) that "[t]he financial portion of the transaction ... [would be] fully agreed to in all its particulars [and paid] by August 31, 1989," and (3) that Antonelli would be released from all of his financial obligations relating to MQI.

Thereafter, the negotiations between Lyon and Campbell, through Antonelli and Broyhill, focused on achieving an arrangement by which MQI could satisfy these conditions. On August 18, 1989, the negotiations culminated in the execution of an "Assignment Agreement" between Broyhill and Antonelli.[3] The purpose of the Broyhill Assignment Agreement was to substitute Broyhill for Antonelli as MQI's financial backer so as to enable MQI to avoid paying the $2 million dollar penalty to purchase the Moler Limestone Quarry. The Broyhill Assignment Agreement provided, *inter alia,* that Broyhill would buy out Antonelli's interests in MQI, including his ownership of the Moler Limestone Quarry (for Antonelli's $940,987.00 acquisition cost); that Broyhill would extend the period in which MQI could exercise its purchase option without penalty until the eleventh year of the lease term; and that Broyhill would take Antonelli's place on the personal guaran-

---

3. The agreement was signed on August 18, 1989 but was dated "as of" August 19, 1989.

tee of the $750,000.00 Sovran Maryland loan. In addition, the Broyhill Assignment Agreement conditioned Broyhill's obligation to close upon Sovran agreeing to substitute Broyhill for Antonelli on the guarantee of the $750,000.00 signature loan and upon Sovran agreeing to extend the term of the $1 million dollar loan facility to September 30, 1990. The Broyhill Assignment Agreement included an integration clause that merged and superseded all previous "agreements, offers, options, discussions, arrangements or understandings" with respect to its subject matter.

Antonelli apprised Lyon of the negotiations leading to the Broyhill Assignment Agreement and the particulars of the agreement, before it was executed. Although Antonelli and Broyhill were the only signatories to the Broyhill Assignment Agreement, both Campbell and Lyon understood that, to implement the agreement, their interests in and obligations to MQI had to remain *status quo*. Broyhill would buy out Antonelli's interest in MQI and step into Antonelli's shoes by furnishing a personal guarantee in place of Antonelli's guarantee of the $750,000.00 signature loan; the guarantees of Lyon, Campbell, and Storke would remain in place. In that way, Broyhill would occupy the identical position with respect to MQI that Antonelli had occupied.

At the same time that the Broyhill Assignment Agreement was being negotiated, Lyon was discussing a possible sale of MQI to Evered, PLC ("Evered"), an English company. In July, 1989, Lyon wrote to Campbell urging that a sale of MQI to Evered be evaluated by MQI's stockholders. Campbell responded promptly, stating that the other MQI stockholders were not interested in selling MQI and cautioning Lyon against "discussing the company's business with others." Nevertheless, Lyon continued discussions with Evered. At trial, Lyon acknowledged that the sale that he was attempting to effectuate would have resulted in the payment of a premium by Evered to him and to Antonelli. On August 23, 1989, four days after the Broyhill Assignment Agreement was executed, Lyon wrote to the MQI shareholders, informing them that Evered was interested in purchasing 100% of MQI's stock.

Lyon did not inform the shareholders that he would personally profit from such a sale.

Also on August 23, 1989, Broyhill, Antonelli, Campbell, and Storke met with Nelson and Cassidy at Sovran Maryland's offices and presented them with the proposal for substituting Broyhill for Antonelli on the $750,000.00 signature loan guarantee and a request to increase the $1 million dollar loan facility to $3 million dollars. Campbell testified that he learned from Antonelli, at the outset of the meeting, before the loan officers arrived, that Lyon would not agree to re-sign a $1.75 million dollar personal guarantee on a loan facility in the amount of $3 million dollars. According to Campbell, he had not had any discussions with Antonelli before that day about Lyon remaining on his guarantee of $1.75 million dollars; nor had he had any direct discussions about that issue with Lyon.

The testimony of Antonelli, Campbell, Broyhill, and Nelson established that the August 23, 1989 meeting about substituting Broyhill on Antonelli's $750,000.00 personal guarantee took place in the context of a discussion about increasing the loan facility to $3 million dollars. Nelson testified that a substitution of Broyhill for Antonelli on the $750,000.00 signature loan guarantee would have required newly-executed guarantees from Lyon, Campbell and Storke, regardless of whether the loan facility were increased to $3 million dollars.

Nelson did not know about the Broyhill Assignment Agreement until the August 23, 1989 meeting. Sovran Maryland had no pre-existing banking relationship with Broyhill. For that reason, according to Nelson, the meeting concluded with Nelson and Cassidy informing the others that they were not comfortable having Broyhill substitute for Antonelli on the $750,000.00 signature loan guarantee. Nelson and Cassidy were aware that Broyhill had a substantial and long-term banking relationship with Sovran Virginia. They suggested that Broyhill contact Sovran Virginia and try to arrange for a loan through it that could be used to pay off MQI's $750,000.00 Sovran Maryland loan. Nelson testified that Sovran Mary-

land was willing to increase the loan facility to $3 million dollars without any personal guarantee from Lyon.

Shortly after the conclusion of the August 23, 1989 meeting, Lyon telephoned Nelson and said that he did not want to sign a new guarantee for $1.75 million dollars if the loan facility were increased to $3 million dollars. Nelson testified that Lyon said he "was not prepared to guarantee the $3 million facility at all."

On August 24, 1989, Broyhill sent Nelson a letter outlining his proposal for a new $3 million dollar loan facility to MQI from Sovran Maryland. The terms of the proposal were: (1) the loan would be secured by MQI's accounts receivable; (2) the due date of the loan would be extended until September 1, 1990; (3) Campbell would guarantee the entire amount of the loan and Lyon would guarantee the first $1,750,000.00; and (4) the proceeds of the loan would be used to satisfy the two outstanding Sovran loans totaling $1,750,000.00. The condition that Lyon would guarantee the first $1.75 million dollars of the total $3 million dollar loan facility was inconsistent with Lyon's previously communicated refusal to do so. Accordingly, Sovran Maryland did not accept the proposal. On the same day, Broyhill wrote Nelson a second letter outlining a different proposal for a $3 million dollar loan. The second proposal did not require any personal guarantees and provided that "it is further understood that Mr. Dominic F. Antonelli, Jr., will be released from his present guarantee of $750,-000." Sovran Maryland also rejected the second proposal.

After Sovran Maryland rejected his proposals, Broyhill refused to go forward with the Assignment Agreement. At trial, Broyhill explained why he withdrew from the agreement:

I was supposed to take Mr. Antonelli's position insofar as his investments and guarantees were concerned in the Millville Quarry. The reason it was finally—or why it was not completely concluded was because, in the end, when I was taking Mr. Antonelli off of these bank loans, or relieving him of his guarantee in the bank loans, I would not receive the same guarantees from the two principals, Mr.

Campbell and Mr. Lyons [sic], that were on the loan that Mr. Antonelli guaranteed. And so, if I couldn't get the same endorsements—in other words, get the same identical position with the bank that Mr. Antonelli had, I would not go through with the deal.

As Campbell put it, Lyon's refusal to re-sign a personal guarantee for $1.75 million—the same amount for which he already was personally obligated—"blew the deal." The Broyhill Assignment Agreement fell through one week before the deadline for MQI to meet the conditions imposed by Antonelli for it to exercise the Moler Lease Option and purchase the quarry at a $2 million dollar savings. Campbell testified that one week was not sufficient time for MQI to make an alternative arrangement to meet Antonelli's terms. August 31, 1989 passed and MQI lost its opportunity to purchase the Moler Limestone Quarry from Antonelli at the discounted price.

After Broyhill withdrew from the Assignment Agreement, the MQI stockholders decided to look into the potential purchase of MQI by Evered. Initially, Campbell was "somewhat receptive" to the proposed sale of MQI. He later "put the sale on hold with no commitment." On September 29, 1989, Antonelli wrote to Campbell informing him that if MQI did not reconsider the Evered offer, he would sell his interest in MQI to a third party. At that, MQI reconsidered Evered's offer.

The Moler Limestone Quarry was essential to MQI's business operations. Knowing that, Evered conditioned its offer to purchase MQI on MQI purchasing the quarry. Campbell re-contacted Antonelli about MQI buying the quarry from him. Antonelli informed Campbell that MQI could purchase the quarry, but only if it paid the $2 million dollar penalty. Campbell objected, but Antonelli would not relent.

By this point, the MQI stockholders wanted to proceed with the sale to Evered. MQI was forced to accept Antonelli's terms. On October 1, 1989, Campbell, Antonelli, Lyon, the Cub Trust, and the shareholders of MQI entered into an agreement providing, *inter alia,* that "in the event of an acquisition of MQI by Evered PLC, Antonelli would convey

the [Moler Limestone Quarry] to MQI for $2,940,987.00." The agreement further provided that "[n]either Campbell, MQI's assignee, nor the other shareholder parties, shall be estopped or precluded from making or asserting any claim in connection with the payment by MQI of the $2,000,000.00 amount called for in Section 1.05 of the Moler Lease and set forth in [this agreement]."

Also on October 1, 1989, MQI's stockholders, Campbell, Lyon, and Antonelli entered into an agreement giving Campbell the right to negotiate the sale of MQI. Lyon, Antonelli, and the Cub Trust agreed not to interfere with Campbell's ability to serve as MQI's lead negotiator and representative. On October 6, 1989, Campbell wrote to Evered to express interest in an acquisition by it of MQI. Negotiations ensued and, on November 26, 1989, MQI and Evered entered into a Purchase Agreement. Evered agreed to purchase MQI for $33,200,000.00. Before the closing on the sale, MQI's stockholders formed MQI Liquidating Corp. ("MQIL") to liquidate MQI's assets. MQI and Evered closed on the sale on January 4–5, 1990. At closing, MQI paid Antonelli $2,940,987.00 for the Moler Limestone Quarry, under protest.

On May 21, 1990, Antonelli wired $2,131,840.00 to the Cub Trust. At trial, Lyon and Antonelli each testified that that sum came from Antonelli's proceeds from the sale of MQI. Lyon testified that Antonelli paid him this sum to reimburse him for payments that he (Lyon) had made to cover Campbell's share of debts to Antonelli arising out of obligations of EC. MQIL presented evidence from which the jury could find, and we presume did find, that the debt that Antonelli ostensibly was paying to Lyon no longer existed and was not the reason for Antonelli's $2.1 million dollar payment.

On August 11, 1992, MQIL, as assignee of the claims of MQI, filed a three-count complaint in the Circuit Court for Prince George's County against Lyon, the Cub Trust, and Ronald L. Williams, Trustee of the Cub Trust for: 1) Count I: "Tortious Interference with Business Relationships—Moler Lease"; 2) Count II: "Tortious Interference with Business

Relationships—MQI/Broyhill Relationship"; 3) Count III: "Breach of Fiduciary Obligation." MQIL alleged that Lyon had acted wrongfully by refusing, at the eleventh hour, to continue as a guarantor on the Sovran Maryland loans, thereby depriving MQI of a substantial business advantage with Broyhill and scuttling MQI's opportunity to purchase the Moler Limestone Quarry at a $2 million dollar discount. MQIL contended that Lyon had acted solely to benefit himself and the Cub Trust. MQIL sought compensatory damages of $2,000,000.00, plus interest and punitive damages.

On February 23, 1993, Lyon filed a motion to dismiss for failure to state a claim for which relief may be granted. The court denied that motion. Thereafter, on December 21, 1994, Lyon filed a motion for summary judgment. The court denied that motion on the ground that discovery was incomplete and disputes of material fact existed. On November 22, 1995, Lyon filed a second motion for summary judgment. The court reserved ruling on that motion at first. Then, on February 20, 1996, the court issued an order denying the motion.

As noted above, *MQIL v. Lyon, et al., Lyon, et al. v. Campbell, et al.* and *Campbell v. Lyon,* were tried together, before a single jury, from May 1 to August 2, 1996. The evidence in *MQIL v. Lyon* was presented from May 2, 1996 until May 20, 1996. At the close of MQIL's case, Lyon moved "to dismiss" on the ground, *inter alia,* that MQIL had not submitted evidence from which the jury reasonably could conclude that Lyon represented that he would continue to guarantee MQI's loans with Sovran Bank or that he had an obligation to do so. The court reserved ruling on the motion. At the close of all of the evidence, Lyon moved for judgment, arguing that there was no evidence to show that his refusal to continue as a guarantor on the Sovran Maryland loans adversely affected consummation of the Assignment Agreement. The court continued to reserve ruling on the motion for judgment.

On August 3, 1996, all three cases were sent to the jury. The jury was given a separate verdict sheet for each case. At

the end of the day, the jury returned verdicts in all three cases. In *MQIL v. Lyon*, it found in favor of MQIL and against Lyon, the Cub Trust and Williams. It determined that Lyon had breached his fiduciary duty to MQI and that he had intentionally interfered, without justification, and for the benefit of himself and of the Cub Trust, with both the Moler Limestone Quarry Purchase Option and the Assignment Agreement. The jury assessed compensatory damages against Lyon only, in the amount of $2 million dollars, together with prejudgment interest of $1,362,196.00. The jury also awarded MQIL $150,000.00 in punitive damages against Lyon.

On August 13, 1996, Lyon filed a motion for judgment notwithstanding the verdict on the ground that, as a matter of law, he could not be held liable for tortious interference or for breach of a fiduciary obligation. Lyon asserted, *inter alia,* that MQIL had presented insufficient evidence to prove that his actions proximately caused or contributed to the demise of the Broyhill Assignment Agreement and to MQI's subsequent inability to purchase the Moler Limestone Quarry at a $2 million dollar discount. After a lengthy hearing, the court denied Lyon's motion for judgment notwithstanding the verdict. On December 18, 1996, Lyon noted this appeal.

### Lyon v. Campbell

On April 29, 1993, Lyon, Lyon's wife Eleanor, and Ronald Williams, as beneficiaries and Trustees of the Cub Trust, sued Campbell, Campbell's wife, Yvonne, Campbell's daughter, Joan Campbell–Alger, and four of Campbell's business associates (Edward Storke, Mike Perkins, Barry Strohm, Robert Jenkins, and Donald Davidson) in their capacities as shareholders, officers, directors, and employees of MQI and MQIL for fraud, conversion, breach of fiduciary duty, and civil conspiracy. The complaint also requested an accounting. The torts alleged were based upon numerous alleged acts of wrongdoing. Some of those acts related to money owed to MQIL by Annapolis Junction, Inc. ("AJ, Inc.").

AJ, Inc. owed MQIL approximately $370,000.00 under an agreement to purchase MQIL's limestone inventory and equipment. In his capacity as President of MQIL, Campbell directed AJ Inc. to refrain from paying MQIL the money it was owed. Michael D. Block, President of AJ, Inc., testified that Campbell directed AJ, Inc. not to pay its debt to MQIL because of his dispute with Lyon. In 1996, AJ, Inc. filed for bankruptcy. It never paid MQIL the $370,000.00.

At the close of the evidence, the jury was given a 44–page verdict sheet setting forth each claim that formed a basis for the torts alleged and further subdividing each claim into separate sections, labeled A through V. The court instructed the jury to decide each claim independently of the others and to decide each claim individually as to each plaintiff and each defendant.

Section A of the verdict sheet addressed the claims for "fraud, conversion, breach of fiduciary duty, and civil conspiracy" pertaining to money owed to MQIL by AJ, Inc. The jury found that Campbell, alone, "committed fraud, conversion, breach of fiduciary duty, or [ . . . ] civil conspiracy [ . . . ][b]y directing A.J., Inc. not to pay its debts to MQI Liquidating or by failing to have MQI Liquidating collect monies owed to it by A.J., Inc." In response to the question, "In what amount, if any, do you award damages?," the jury indicated "0" after the name of each plaintiff (including Lyon). On all of the remaining claims, the jury found that the defendants did not commit any wrongdoing.

Question V of the verdict sheet listed the plaintiffs and asked whether each had "standing to sue in the claims set out" in *Lyon, et al. v. Campbell, et al.* The jury answered "no" as to each plaintiff. Lyon noted an appeal from the adverse judgment.[4]

---

**4.** Lyon is the only appellant in *Lyon, et al. v. Campbell, et al.* Counsel for the plaintiffs in *Lyon, et al. v. Campbell, et al.* filed a notice of appeal of the verdict as "Attorney for Plaintiff John Lyon."

## DISCUSSION

### MQIL v. Lyon

### I.

### Tortious Interference—Proximate Cause

#### (a)

Lyon contends that MQIL failed to present a submissible case of tortious interference because there was no proof that wrongful conduct on his part caused the Broyhill Assignment Agreement to fail, thereby causing MQI to lose the opportunity to exercise the Moler Lease Option and to buy the Moler Limestone Quarry at a $2 million dollar discount. Specifically, Lyon maintains that the only evidence of conduct on his part that was causally connected to the demise of the Broyhill Assignment Agreement was his refusal to guarantee an increased $3 million dollar loan facility and that that conduct was not wrongful; in the absence of proof that his conduct was both wrongful and proximately caused the Broyhill Assignment Agreement to fail and MQI to sustain economic injury, the evidence was insufficient to support a verdict against him for tortious interference.

MQIL counters that it never alleged or maintained that Lyon's refusal to guarantee $1.75 million dollars of a new $3 million dollar loan facility was itself wrongful or that Lyon intentionally misrepresented that he would do so. It contends that Lyon acted wrongfully by leading MQI and its shareholders down the "primrose path" by allowing them to think that he would do what was necessary to maintain the *status quo* and, at the last minute, when it was too late for MQI to arrange financing with anyone other than Broyhill, "pulling the rug out." In other words, MQIL maintains that the timing of Lyon's conduct made it wrongful and that that wrongful conduct "blew" the Broyhill Assignment Agreement, causing MQI to lose its $2 million dollar business opportunity.

In *Willner v. Silverman,* 109 Md. 341, 71 A. 962 (1909), the Court of Appeals listed the elements of the tort of

wrongful interference with contractual or business relationships:

'(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.'

*Id.* at 355, 71 A. 962 (quoting *Walker v. Cronin,* 107 Mass. 555, 562 (1871)). *See also Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 71, 485 A.2d 663 (1984). Tortious or deliberate intent to harm a plaintiff's business relationship is not alone sufficient to support an intentional interference claim. There also must be proof that the defendant's conduct in interfering with contract or business relations was accomplished through improper means. *Alexander v. Evander,* 336 Md. 635, 656, 650 A.2d 260 (1994); *Macklin v. Logan Assocs.,* 334 Md. 287, 301, 639 A.2d 112 (1994). Consequently, to recover for tortious interference with business or contractual relationships, the defendant's conduct must be "independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships." *Alexander,* 336 Md. at 657, 650 A.2d 260. *See also Macklin,* 334 Md. at 301, 639 A.2d 112; *Travelers Indemnity v. Merling,* 326 Md. 329, 343, 605 A.2d 83 (1992).

To establish causation in a tortious interference action, the plaintiff must prove that the defendant's wrongful or unlawful conduct proximately caused the injury alleged. *Medical Mut. v. Evander,* 339 Md. 41, 54, 660 A.2d 433 (1995); *Macklin,* 334 Md. at 301–02, 639 A.2d 112. The injury must be a " 'natural, proximate and direct effect of the tortious misconduct.' " *Evander,* 339 Md. at 54–55, 660 A.2d 433 (quoting *Jones v. Malinowski,* 299 Md. 257, 269, 473 A.2d 429 (1984)). Tortious conduct may be the proximate cause of an injury without being its sole cause. *Evander,* 339 Md. at 55, 660 A.2d 433; *Atlantic Mutual v. Kenney,* 323 Md. 116, 127, 591 A.2d 507 (1991). To create a jury issue, a plaintiff need only introduce evidence to show that, more likely than not, the defendant's wrongful conduct caused the injury alleged.

*Evander,* 339 Md. at 55, 660 A.2d 433; *Peterson v. Underwood,* 258 Md. 9, 17, 264 A.2d 851 (1970); *Otis Elevator v. LePore,* 229 Md. 52, 58, 181 A.2d 659 (1962); *Washington Suburban Sanitary Comm'n v. Grady Dev.,* 37 Md.App. 303, 309, 377 A.2d 557 (1977). Under this standard of proof, the plaintiff is not required to exclude every possible cause of his injury. *Peterson,* 258 Md. at 17, 264 A.2d 851; *Unsatisfied C. & J. Fund Bd. v. Bowles,* 25 Md.App. 558, 562–63, 334 A.2d 532 (1975).

■ We have carefully reviewed in its entirety the extensive trial record in this case. Our review reveals the following: First, there was no evidence of an agreement by Lyon (directly or through Antonelli) to execute a $1.75 million dollar guarantee of an increased $3 million dollar loan facility. Campbell testified that he learned for the first time at the August 23, 1989 meeting that Lyon would not continue his personal guarantee of $1.75 million dollars if the loan facility were increased to $3 million dollars. Campbell did not testify that at some time before the August 23, 1989 meeting, Lyon or Antonelli on Lyon's behalf represented that Lyon would stay on the $1.75 million dollar guarantee if the loan facility were raised to $3 million dollars. To the contrary, Campbell testified that he had no direct conversation with Lyon prior to that meeting and that he did not discuss the matter of Lyon's guarantee with Antonelli until the meeting. The only evidence of Lyon's reaction to the concept of increasing the loan facility to $3 million dollars was his March 1988 refusal to agree to guarantee an increased loan facility unless all of MQI's shareholders would execute personal guarantees as well.

Second, there was no evidence that Lyon represented or in some way created the impression that he would sign a $1.75 million dollar guarantee on a $3 million dollar loan facility or that Lyon engaged in conduct that led others to think that he would do so. At most, the evidence established that Lyon knew, through Antonelli, of the terms of the Broyhill Assignment Agreement and also knew that, for that agreement to be consummated, the existing loan guarantors (except Antonelli)

would have to take steps necessary to maintain the *status quo,* including re-signing guarantees with Sovran Bank that would contain Broyhill's name in substitution for Antonelli. Yet, the only evidence of what constituted the *"status quo"* established that if Lyon signed a guarantee of $1.75 million dollars on a new $3 million dollar loan facility, he would *not* be maintaining his position as a guarantor of $1.75 million dollars on two loans totaling $1.75 million dollars. The undisputed testimony of David Nelson established, to the contrary, that Lyon's potential exposure would increase under the new guarantee, because his potential risk would increase.

Third, there was no evidence that the terms of the Broyhill Assignment Agreement contemplated that the $1 million dollar loan facility would be increased to $3 million dollars, so as to require the guarantors to execute new guarantees accepting that term or so as to suggest that the guarantors, including Lyon, had indicated a willingness to do so. Indeed, whereas the Broyhill Assignment Agreement specified as a condition to settlement extension of the term of the $1 million dollar loan facility to September 30, 1990, it contained no reference whatsoever to an increase in that loan.[5]

Finally, there was no evidence that Lyon refused to sign a new guarantee that was exactly like the guarantees in place (*i.e.,* a $1.75 million dollar guarantee on a total loan amount of $1.75 million dollars), except with Broyhill's name substituted for Antonelli's. To the contrary, the only evidence of a refusal by Lyon to sign a new guarantee was that he refused to sign a $1.75 million dollar guarantee on $3.75 million dollars in loans.

---

5. Broyhill testified that his August 24, 1989 letter to Sovran Maryland proposing a new $3 million dollar loan facility of which $1.75 million dollars would be personally guaranteed by Lyon, "was pretty much a written understanding of my position that I had already presented orally to them. And it was stating the position I thought was Mr. Antonelli's position that I was assuming." If by this testimony Broyhill was intimating that the Assignment Agreement called for an increase in the loan facility to $3 million dollars, the written agreement demonstrates that he was wrong.

In *Med. Mut. v. Evander, supra,* relied upon by Lyon in support of his proximate causation argument, the Court held that a plaintiff in an intentional interference with contract or business relations case must put forth evidence to show that wrongful conduct of the defendant, not lawful conduct of the defendant, caused the harm for which damages are sought. In that case, an insurance company terminated its business relationship with an insurance agency after the agency began promoting a competing insurer's product. Neither party disputed that the insurer was entitled to end the business relationship. The insurer sent a letter to its insureds, informing them of the termination. Approximately 480 of the insureds who received the letter left the agency and either enrolled with a new agent or obtained insurance from the insurer directly. The agency brought suit against the insurer for wrongful interference with business relationships, alleging that the insurance company's letter to its insureds had contained defamatory language that disparaged the agency's business. In reversing a judgment in favor of the agency, the Court of Appeals held that the agency had not introduced evidence to show that "the alleged defamation in ... the letter, rather than [the insurer's] lawful termination of [the agency], caused the [agency] loss of business from [the insurer's] insureds." *Evander,* 339 Md. at 57, 660 A.2d 433.

In the case *sub judice,* the only evidence of an act (or omission) of Lyon that was causally linked to the demise of the Broyhill Assignment Agreement was his refusal to sign a $1.75 million dollar guarantee on $3.75 million dollars in loans. Almost from the outset of this case, MQIL has conceded that Lyon had no independent duty to sign a new loan guarantee on a $3 million dollar facility. MQIL does not maintain now that Lyon owed such a duty and we are not aware of any law supporting the proposition that a company stockholder owes an independent duty, apart from a duty arising by agreement, to guarantee personally monies loaned to the corporation or, when the stockholder already has given a personal guarantee, to take on added future risk or exposure above and beyond that which he has already undertaken. To the contrary, even

one who occupies a fiduciary relationship with regard to a corporation is not under a legal obligation "to accede to ... demands of the [c]orporation which [are] adverse to [his] personal financial interests." *Waterfall Farm Systems, Inc. v. Craig,* 914 F.Supp. 1213, 1228 (D.Md.1995)(Harvey, J.).

■ "[U]nder Maryland law, one who, regardless of motive, causes harm to another merely by refusing to continue a business relationship terminable at will is not liable for that harm." *Purity Products, Inc. v. Tropicana Products, Inc.,* 702 F.Supp. 564, 575, n. 16 (D.Md.1988), *aff'd,* 887 F.2d 1081 (1989)(citing *Cunningham v. A.S. Abell Co.,* 264 Md. 649, 658, 288 A.2d 157, *cert. denied,* 409 U.S. 865, 93 S.Ct. 160, 34 L.Ed.2d 114 (1972)). Lyon could not unilaterally remove himself from his personal guarantee to Sovran Maryland of $1.75 million dollars of MQI's $1.75 million dollar loan obligation. Had the evidence shown that Lyon refused to continue to guarantee that sum on that total exposure on that risk, there would have been sufficient evidence on which the jury could have found that his conduct was wrongful. There was no such evidence. The evidence established only that Lyon refused to accede to a new business relationship with MQI that would have been adverse to his personal financial interests, *i.e.,* one in which he would have personally guaranteed the same sum, but with greater exposure and thus greater risk. Lyon had no legal obligation to MQI to so agree. As such, his actions were "with neither an 'unlawful purpose' nor 'without right or justifiable cause'" and could not be grounds for a tortious interference claim. *PPM America, Inc. v. Marriott Corp.,* 853 F.Supp. 860, 880 (D.Md.1994). Lyon is correct that the evidence established only that he refused to do something he had the right to refuse to do and that, under *Evander,* evidence of harm to MQI's business relationship/contract with Broyhill brought about by his rightful refusal to act cannot support the verdict against him.

■ We disagree with MQIL that the timing of Lyon's refusal to sign the new guarantee made his refusal wrongful. A deliberate delay in exercising a lawful right does not make

the act of exercising the right a wrongful act. Moreover, even if we were to assume, *arguendo,* that that could be the case, there was no evidence introduced to show that Lyon knew, before August 23, 1989, that Broyhill and Campbell expected him to execute a new guarantee on an increased loan facility and that, armed with that knowledge, he delayed his refusal to execute the guarantee until it was too late for MQI to arrange for financial backing with someone other than Broyhill. Indeed, the evidence established that because MQI failed to exercise the Moler Lease Option within ninety days of its expiration, it was forced to accept Antonelli's new terms and to obtain new financial backing, all in a tight time frame. By the time that the Broyhill Assignment Agreement was negotiated, only two weeks remained for MQI to meet Antonelli's terms. Not until one week was remaining did Broyhill, Campbell, and the others approach Sovran Maryland about substituting Broyhill on Antonelli's guarantee, a condition essential to consummation of the Broyhill Assignment Agreement. The evidence presented established only that the idea of increasing the loan facility to $3 million dollars first was raised that day, at the eleventh hour, and was immediately refused by Lyon. There was no evidence that the eleventh-hour time frame in which the events took place resulted from any wrongful conduct on Lyon's part.

### (b)

■ Lyon further argues that there was a "total failure of proof that the [Broyhill Assignment] Agreement would have been consummated" in any event because there was no evidence that Sovran Maryland would have accepted the substitution of Broyhill for Antonelli on the $750,000.00 signature loan, a condition precedent to consummation. As such, Lyon maintains, there was no evidence on which the jury could have based a finding that the demise of the Broyhill Assignment Agreement was caused by conduct on his part and not by Sovran Maryland's rejection of the Broyhill substitution condition. We agree.

David Nelson testified that Sovran Maryland "wasn't comfortable" with the proposed substitution as presented at the August 23, 1989 meeting. He explained that Sovran Maryland was not familiar with Broyhill and, therefore, would not readily accept his substitution for Antonelli's signature guarantee:

> [W]hen you're dealing in a signature guarantee, a lot of it is relationship based as to activities with the bank. . . . [I]n a signature guarantee, you're relying on the guarantor to step up and get you your money back, so you have to have the confidence and comfort in that individual that he either has . . . one, he has capability, and two, from the perspective of the bank, that he has the credibility to pay you back . . . [A] signature is as good as the signature. It's not secured, so you have to have to have the confidence or trust as you will—that he will pay you back if it happens.

The possibility of Broyhill contacting Sovran Virginia to obtain a loan or line of credit of $750,000.00 to pay off the Sovran Maryland $750,000.00 loan was discussed at the August 23, 1989 meeting. There was no evidence, however, that Broyhill or anyone acting on his behalf pursued that avenue for funds. The only evidence submitted to the jury established that the substitution proposals that were made to Sovran Maryland were rejected by it.

We are mindful that "the matter of causation [does not have] to be proved by direct and positive proof to an absolute certainty." *Otis Elevator v. LePore, supra,* at 57, 181 A.2d 659. Circumstantial evidence that supports a "rational inference" of causation is legally sufficient. *Id; see also Peterson v. Underwood, supra,* at 17–18, 264 A.2d 851 ("proof of causation by circumstantial . . . evidence . . . is not inherently insufficient; all that is necessary is that it amount to a reasonable likelihood or probability rather than a possibility."). Nevertheless, causation evidence that is wholly speculative is not sufficient. *Myers v. Bright,* 327 Md. 395, 399, 609 A.2d 1182 (1992); *Fowler v. Smith,* 240 Md. 240, 247, 213 A.2d 549 (1965); *Bethlehem Steel Co. v. Jones,* 222 Md. 54, 58, 158 A.2d 621 (1960); *Reeves Motor Co. v. Reeves,* 204 Md. 576, 581, 105 A.2d 236 (1954). Only speculation could have led the jury in

this case to conclude that Sovran Maryland would have agreed to substitute Broyhill for Antonelli on the $750,000.00 signature loan or that Sovran Virginia would have provided the funds necessary to take Antonelli's name off of the $750,000.00 guarantee. As *Med. Mut. v. Evander* instructs, "a defendant may not be held liable in damages for a plaintiff's loss if he can show 'not only that the same loss *might* have happened, but that it *must* have happened if the act complained of had not been done.'" 339 Md. at 55, 660 A.2d 433 (quoting *Baltimore & Potomac R.R. Co. v. Reaney*, 42 Md. 117, 137 (1875)). *See also Charleston Area Med. Ctr. v. Blue Cross*, 6 F.3d 243, 248 (4th Cir.1993)(evidence insufficient to establish that insurance company's conduct interfered with another insurance company's efforts to merge or affiliate with other plans in the absence of evidence "that any other entity was willing and able to entertain [such an] affiliation ...."). Without Sovran Maryland's agreement to substitute Broyhill for Antonelli, the Broyhill Assignment Agreement was doomed, as was MQI's opportunity to exercise the Moler Lease Option at a $2 million dollar discount; and there was no evidence that Sovran Maryland had accepted or was going to accept the substitution. Under the circumstances, the evidence that Lyon's conduct proximately caused the Broyhill Assignment Agreement to fail was insufficient to support the verdict.

## II.

### Misrepresentation

Lyon contends that there was not sufficient evidence to submit the issue of his alleged "misrepresentation" to the jury. MQIL counters that Lyon's argument is a *non sequitur*, as it did not allege a cause of action for misrepresentation against Lyon.

As we have explained, to the extent that MQIL's tortious interference claims against Lyon were predicated upon an alleged misrepresentation by Lyon of his intention to sign a new personal guarantee of loans extended to MQI by Sovran Maryland, there was no evidence that Lyon represented that

he would sign a guarantee for $1.75 million dollars on a total loan indebtedness of $3.75 million dollars.

## III.

### Breach of Fiduciary Obligation

Lyon next argues that the evidence was insufficient to support the jury's finding that he owed and breached a fiduciary duty to MQI or to its shareholders. Lyon contends that because he and Campbell "were engaged in open warfare," he did not owe MQI or the other shareholders in MQI a fiduciary duty or obligation, as the relationship was not one that engendered trust or confidence.

The trial court instructed the jury on the issue of a fiduciary duty as follows:

A fiduciary relationship exists between two parties when one of them, called the beneficiary, has the right to put trust and confidence in and actually does put trust and confidence in the other party, called the fiduciary, so that there is a resulting beneficiary. If there is a fiduciary relationship, then the fiduciary must act in good faith and with due regard for the interest of the beneficiary.

Plaintiffs alleging breach of fiduciary duty must prove the existence of a fiduciary relationship, breach of duty owed by the fiduciary to the beneficiary, and harm to the beneficiary resulting from that breach.

When a corporation has just a few shareholders, that is, when just a small number of persons own shares in the corporation and the corporation is run like a partnership among the shareholders, then the shareholders owe the corporation and the other shareholders duties of loyalty, good faith, and fair dealing, as well as a duty not to injure the corporation.

MQIL premised its breach of fiduciary obligation claim against Lyon upon MQI's operation as a closely held corporation. In its complaint, MQIL alleged that because MQI was organized as a close corporation, "each shareholder

owed a fiduciary obligation and duty to MQI and to each other to deal fairly, in good faith and with loyalty and not to act out of avarice, expediency or self-interest in a manner inconsistent with the interest of MQI and the other shareholders." In his answer to the complaint, Lyon admitted this allegation. He did not thereafter attempt to withdraw or to amend that admission; nor did he take exception to the court's jury instruction on fiduciary duty. Lyon failed to contest the existence of a fiduciary duty before the trial court. He cannot now contest it on appeal. Md. Rule 8–131(a).

In its complaint, MQIL further alleged that Lyon, the Cub Trust, and the trustees of the Cub Trust breached their fiduciary duties to MQI when Lyon:

[R]efused, without any justification and with actual malice, to execute the substitute guarantee of MQI's loan from Sovran [Maryland], thereby interfering with MQI's business relationships and depriving MQI of its ability to purchase the [Moler Limestone Quarry] from Antonelli at a cost equal to Antonelli's cost of acquisition and depriving MQI of its prospective business advantage with Broyhill.

Under Maryland law, one who stands in a fiduciary relationship to a corporation must not acquire or interfere with property in which the corporation has an interest or a reasonable expectancy in detriment to the corporation. *Pittman v. American Metal,* 336 Md. 517, 523, 649 A.2d 356 (1994) (citing 3 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 861.10, at 284 (perm. ed. rev.vol. 1994)). This rule, known as the corporate opportunity doctrine, prohibits a fiduciary from usurping, for his personal benefit, a business opportunity rightfully belonging to the corporation. *See Pittman,* 336 Md. at 522, 649 A.2d 356 ("'when presented with a business opportunity to fulfill a corporate purpose, [the fiduciary] should take advantage of it, not for himself, but for the corporation.'" (quoting *Faraclas v. City Vending Co.,* 232 Md. 457, 463, 194 A.2d 298 (1963)); *Indurated Concrete Corp. v. Abbott,* 195 Md. 496, 503, 74 A.2d 17 (1950)(fiduciaries must not "'use their positions to advance

their own individual interest as distinguished from that of the corporation ...' ")(quoting *Cumberland Coal & Iron Co. v. Parish*, 42 Md. 598, 605–06 (1875)). The Court of Appeals has recognized that, although the corporate opportunity doctrine ordinarily applies to officers and directors, "'comparable duties and standards should be imposed when the party whose conduct is in question is a stockholder.'" *Pittman*, 336 Md. at 523, 649 A.2d 356 (quoting *David J. Greene & Co. v. Dunhill International, Inc.*, 249 A.2d 427, 434 (Del.Ch.1968)).

██ Even if we assume without holding that, by virtue of MQI's operation as a closely held corporation, Lyon owed MQI a fiduciary duty and that, given Lyon's admission that he owed such a duty, he was obligated not to usurp a corporate opportunity from MQI, the evidence was insufficient to support the verdict against Lyon. As we have explained already, Lyon's refusal to guarantee an increase in the $1.75 million dollar loan facility to $3 million dollars was not improper or unlawful. Lyon's status as a fiduciary to MQI did not obligate him to guarantee an increase in the loan facility, at additional personal financial risk. *See Waterfall Farm Systems, Inc. v. Craig, supra*, at 1228. Accordingly, the evidence could not support a finding that Lyon breached a fiduciary obligation to MQI. *See Kann v. Kann*, 344 Md. 689, 713, 690 A.2d 509 (1997)("[T]here is no universal or omnibus tort for the redress of breach of fiduciary duty by any and all fiduciaries. This does not mean that there is no claim or cause of action available for breach of fiduciary duty. Our holding means that identifying a breach of fiduciary duty will be the beginning of the analysis, and not its conclusion.").

### Lyon v. Campbell

Lyon challenges the jury's finding that he lacked standing to sue Campbell for fraud, conversion, breach of fiduciary duty, and civil conspiracy arising out of Campbell's handling of the AJ, Inc. claim. Lyon argues that standing is a legal issue that should have been addressed by the court and decided in his favor. He contends that the jury did not award him any

damages for the wrongs committed by Campbell because it found that he did not have standing to sue.

 Even if we assume, *arguendo*, that the trial court erred in submitting the issue of standing to the jury to decide, instead of deciding the issue itself, and even if we assume further that Lyon did have standing, as a matter of law, to pursue the claims relating to AJ, Inc. against Campbell, any error on the part of the court was harmless.

The trial court instructed the jury that if it found liability, or "fault," on the claims presented, it "may, but [was] not required to, go on to award damages." The court explained the process for filling out the verdict sheet in each case as follows:

[T]he questions go one behind the other. And it may seem to you that there are, for example, on some of them some limitations questions. It may seem to you that it would be logical just to say, assuming, and I'm not assuming you should, but let's assume in a particular claim you decide that it's barred by limitations. And then yet you still have to fill out whether you find for one or the other.

And the reason that that is there is because there are legal reasons that you have to do that, so you don't do limitations first. You do it down the sheet somewhere.

So we want you to make the finding, and then find whether or not it's barred.

With respect to the verdict sheet in this case, the court told the jury:

[Y]ou'll notice the main question, the first questions ... And then you'll see "A," "B," "C," "D," and it goes through these pages.... Some of them will be obvious to you. Once you have answered them in a particular way, then that would be the way that you would answer them on the next one as well because they are the same—have to do with the same issue.

The trial court clearly instructed the jury to consider each claim separately in the order presented in the verdict sheet, question by question, without regard to the impact of the

answer to a particular question on the claim. Our examination of the verdict sheet in *Lyon, et al. v. Campbell, et al.* reveals that the jury did precisely as instructed. It answered all of the questions respecting whether the plaintiffs had released their claims and respecting whether the claims were time-barred, even when it found no liability on those claims. It did so in conformity with the trial court's instruction, irrespective of the fact that the subissues that it was deciding were of no ultimate effect.

"In reconciling a jury's answers to specific interrogatories, we should assume that the jury was rational and consistent, rather than irrational or inconsistent." *Edwards v. Gramling Engineering Corp.*, 322 Md. 535, 547–48, 588 A.2d 793 (1991). The standing question posed to the jury was the last question on the 44 page verdict sheet in *Lyon, et al. v. Campbell, et al.* Lyon urges us to conclude that because the jury answered the final standing question on page 44 negatively, its answer to the damage question relating to the AJ, Inc. claim on page 3 cannot be accepted as a valid jury finding of no damages on that claim. To reach such a conclusion, however, we would have to find that a jury that otherwise meticulously obeyed the trial court's instruction to answer each question independently failed to follow that instruction with respect to the damage question on the AJ, Inc. claim. We refuse to adopt an argument predicated upon the jury acting inconsistently, irrationally, and illogically.

The jury found that Campbell committed torts against Lyon and the other plaintiffs with respect to the AJ, Inc. claim but that neither Lyon nor the other plaintiffs were to be awarded damages. The damage question posed on page 3 of the verdict sheet gave the jury the option of awarding no damages by including the proviso "if any." The only logical interpretation of the verdict is that the jury found that Lyon and his co-plaintiffs did not sustain damages. As such, any error by the trial court in submitting the issue of standing to the jury was harmless.

Finally, as Lyon acknowledges, the jury's verdict rendered his request for an accounting moot. Our affirmance of that verdict further moots his argument that the trial court erred in not granting an accounting.

*Lyon v. MQIL*

**JUDGMENT REVERSED.**

*Lyon v. Campbell*

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID 50% BY MQIL AND 50% BY JOHN W. LYON.**