**ULTRASOUND IMAGING
CORPORATION,**
Plaintiff

v.

**THE AMERICAN SOCIETY OF
BREAST SURGEONS, et
al., Defendants**

No. RWT 03–CV–3015.

United States District Court,
D. Maryland.

Feb. 25, 2005.

Jared Kenric Ellison, Temple Law Offices, Washington, DC, for Plaintiff.

Charles O. Monk, II, Jennifer B. Speargas, Saul Ewing LLP, Baltimore, MD, Jeffrey A. Powell, William R. Lester, Segal Fryer Shuster and Lester PC, Atlanta, GA, for Defendants.

### MEMORANDUM OPINION

TITUS, District Judge.

This cause of action arises out of the relationship between two entities involved in the detection and treatment of breast cancer. The Plaintiff, Ultrasound Imaging Corporation ("Ultrasound"), is a for profit company which is "in the business of providing ultrasound equipment to Breast Surgeons for the purpose of early detection of breast cancer[.]" Compl. ¶ 7. Ultrasound also provides free courses for accredited breast surgeons. *See* Zaglin Dep. at 79; Compl. ¶ 7. The Defendants are the American Society of Breast Surgeons ("The Society"), a not-for-profit organization of surgeons who are "concerned about access to the latest breast technologies and quality of patient care[,]" and Dr. Richard Fine, its President. Fine Aff. ¶ 3.

In its Complaint, Ultrasound alleges that Defendants engaged in various business torts and anticompetitive behavior in an effort to injure its business. Ultrasound's specific averments relate to Defendants' alleged interference with (1) its classes for accredited doctors, (2) its ad-

vertising at and participation in Society events, and (3) its ability to present its equipment and courses at the same hotel where the Society hosted its annual conference. Compl. ¶ 7–28. The Complaint asserts three causes of actions arising out of these activities: Count I alleges a claim for Tortious Interference with Contract, Count II alleges a claim for Tortious Interference with Business Relationships, and Count III alleges a claim for Illegal Restraint of Trade in Violation of Sections 1 and 2 of the Sherman Act. Compl. ¶ 30–44. The Defendants have moved for Summary Judgment.

Having considered the memoranda of the parties the Court now rules, no hearing being deemed necessary. Local Rule 105.6. For the reasons that follow, Defendants' Motion for Summary Judgment will, by separate order, be granted.

## BACKGROUND

Ultrasound is a Georgia corporation, formed in 1992, owned and controlled by Mr. Larry Zaglin. Zaglin Dep. ¶ 48–49. Ultrasound's business plan is the distribution of medical equipment, specifically ultrasound systems, and other electronics devices such as printers and image management systems. *Id.* at ¶ 54–65. Mr. Zaglin testified that over the previous twelve years Ultrasound has had relationships with various ultrasound system organizations. *Id.* at ¶ 54–64. Currently, Ultrasound's only ultrasound client is Shantou Institute of Ultrasonic Instruments (SIUI). *Id.* at ¶ 56–57. Ultrasound does, however, currently work with manufacturers of non-medical equipment such as Sony, Mitsubishi, and Dell. *Id.* at 64–65.

Ultrasound's allegations against The Society and Dr. Richard Fine relate to the alleged tortious behavior undertaken by them as a means of injuring Ultrasound's ability to compete in the ultrasound market. Ultrasound makes broad allegations

that Dr. Fine "has used his position of authority as the President of the Society ... to prevent The Ultrasound Store's [sic] from successfully obtaining the Society [sic] permission to exhibit and advertise lower priced ultrasound systems and free accredited breast courses[.]" *Id.* at ¶ 21. The Complaint, however, is laced with vague and conclusory statements that make it very difficult to determine precisely what activities Ultrasound alleges give rise to a cause of action. *See e.g., id.* at ¶ 17 ("Fine ... has continuously intentionally interfered with the business of The Ultrasound Store[.]"); *id.* at ¶ 19 ("Fine has a fiduciary responsibility to the Society ... however Fine has acted contrary and breached his fiduciary duty to the Society."). Moreover, Ultrasound's failure to support its Opposition to Defendants' Motion for Summary Judgment with any depositions, answers to interrogatories, or affidavits makes it very difficult for the Court to flesh out precisely what behavior allegedly gives rise to the business torts listed in the Complaint. There is one factual allegation, however, that is specifically set forth in the Complaint.

Ultrasound alleges that the Defendants prevented it from making a separate presentation of its products at the hotel that The Society was using for its annual conference in May 2003. *Id.* at ¶ 27. According to Ultrasound, Dr. Fine accomplished this feat by occupying the Atlanta, Georgia Hyatt suite that Ultrasound had reserved. *Id.* at ¶ 27; P's Opp. at ¶ 16–23. Because Ultrasound had advertised, by hanging posters in the hotel, that its products could be found in that particular suite, it claims to have suffered injury to its business and reputation. P's Opp. at ¶ 20–26. Ultrasound concludes that "Dr. Fine intentionally took the Ultrasound Store's reserved room and refused to leave the room that the Ultrasound Store had contracted for to prevent the Ultrasound Store from demon-

strating and selling its ultrasound machines." P's Opp. at ¶ 25. This conclusion, similar to the conclusory statements in Ultrasound's Complaint, is not supported by any documentation or discovery materials typically submitted as exhibits accompanying the opposition to a Motion for Summary Judgment.[1]

Although it is not alleged in the Complaint, Ultrasound's Opposition to Defendants' Motion for Summary Judgment states that Defendants tortiously interfered with its relationship with "one of the top ten medical imaging companies in the world, Shimadzu." P's Opp. at ¶ 8. Ultrasound submits a letter sent to an agent of Shimadzu from counsel for The Society. P's Ex. B. The letter appears to respond to a letter Shimadzu sent to The Society. It states that The Society will not permit Ultrasound to have any access to The Society or its workshops. *Id.* The letter goes on to state that although The Society refuses to give Ultrasound access to its workshops, Shimadzu itself is not barred from applying to participate at future Society programs. *Id.* Soon after The Society issued this letter, Shimadzu terminated its relationship with Ultrasound. *See* P's Ex. C. Ultrasound claims that the Defendants caused this termination by improper means and, as a result, it suffered "great humiliation in the industry and severe financial damages." P's Opp. at ¶ 12.

## DISCUSSION

This case comes before the Court on Defendants' Motion for Summary Judgment. *See* Fed.R.Civ.P. 56. Pursuant to Federal Rule of Civil Procedure 56, "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A material fact is one that 'might affect the outcome of the suit under the governing law.'" *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183 (4th Cir.2001) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Supreme Court has made clear that in order for the non-moving party to raise a genuine issue of material fact, that party "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. The Court may rely only on facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation ... to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987) (citing *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548).

In the moving papers before the Court, Ultrasound has not submitted any discovery materials to support the assertions made in its pleadings. Thus, it has ignored the Supreme Court's teachings that "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in

---

1. Ultrasound does, as Exhibit E to its Opposition to Summary Judgment, submit a reservation sheet from the Grand Hyatt in Atlanta, Georgia. This exhibit, however, does not support Ultrasound's averments or contradict Defendants' submissions. The fact that the Grand Hyatt permitted Dr. Fine, rather than Larry Zaglin, to occupy this suite (number 2106) does not support the allegation that Dr. Fine intentionally and tortiously interfered with Ultrasound's ability to exhibit its products. Exhibit E only indicates that the Grand Hyatt in Atlanta, Georgia did not reserve a specific suite for Mr. Zaglin as it promised to do.

Rule 56(c), *except the mere pleadings themselves* [.]" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (emphasis added); *see also Anderson,* 477 U.S. at 256, 106 S.Ct. 2505 ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."). The Court is aware that all inferences are to be given to the nonmoving party, but Rule 56 "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts' showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (citing Fed.R.Civ.P. 56(e)). The Court concludes that there are no genuine issues of material fact because Ultrasound has utterly failed to meet this requirement. Moreover, the Court notes that, regarding issues on which the nonmoving party will have the burden of proof at trial, it is that party's responsibility to support its motion or opposition with an affidavit or similar evidence. *See Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Again, because Ultrasound has not taken advantage of the various discovery devices to flesh out the facts relating to its claims, it has placed itself in a difficult position.

Ultrasound's Complaint alleges two variations of the tort of tortious interference with business relationships: Count I, tortious interference with contract; and Count II, tortious interference with business relationships.[2] The differences between these two torts are well-documented under Maryland law.

[T]he two general types of tort actions for interference with business relationships are inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract. The principle underlying both forms of the tort is the same: under certain circumstances, a party is liable if he interferes with and damages another in his business or occupation. The two types of actions differ in the limits on the right to interfere which will be recognized in either case. Thus, where a contract between two parties exists, the circumstances in which a third party has a right to interfere with the performance of that contract are more narrowly restricted. A broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved.

*Natural Design v. Rouse Co.,* 302 Md. 47, 485 A.2d 663, 674 (1984) (citations omitted). Thus, under the tortious interference with contract claim, Defendants are given less leeway to interfere with the economic relationship, but Ultrasound has the burden of proving that a contract exists.

Under Maryland law, "[t]he elements of tortious interference with contract are: 1) existence of a contract between plaintiff and a third party; 2) defendant's knowledge of that contract; 3) defendant's intentional interference with that contract; 4) breach of that contract by the third party; 5) resulting damages to the plaintiff." *Fraidin v. Weitzman,* 93 Md.App. 168, 611 A.2d

2. Although Ultrasound's second count is styled "tortious interference with business relationships" (actually Count Two is titled "tortuous," but the Court will assume that Plaintiff intended to use the work "tortious"), it is more properly tortious interference with economic relationships. In Maryland the umbrella tort of tortious interference with business relationships and has two forms, tortious interference with economic relationships in the absence of a breach of contract and tortious interference which induces the breach of an existing contract. *See Natural Design v. Rouse,* 302 Md. 47, 485 A.2d 663, 674 (1984).

1046, 1057 (1993) (citing *Fowler v. Printers II*, 89 Md.App. 448, 598 A.2d 794, 802 (1991)). The averments in Count I of the Complaint concern Defendants' refusal to accredit Ultrasound as a provider of ultrasound equipment. *See* Compl. ¶ 31–33. These averments do not make out a claim for tortious interference with contract for numerous reasons. First and foremost, it is undisputed that Ultrasound never had a contract with The Society or Dr. Fine, thus "[o]bviously if there is no *valid* contract, one cannot be said to have interfered with its existence." *Fraidin*, 611 A.2d at 1057 (citations omitted). Second, even if Ultrasound and Defendants had at one time been engaged in a contractual relationship, the dissolution or termination of that relationship is clearly not actionable under this tort because the contract must have been between Ultrasound and a third party, not between Ultrasound and Defendants.

In its Opposition, Ultrasound suggests that Defendants interfered with its relationship with Shimadzu, Ultrasound's ultrasound equipment distributor. Significantly, Ultrasound does not characterize this relationship as contractual, but rather states that "the Ultrasound Store had an ongoing, amicable profitable business relationship with one of the top ten medical imaging companies in the world." P's Opp. at ¶ 8. Under *Natural Design*, Ultrasound's failure to characterize the relationship as contractual is not simply a matter of semantics. Third parties, such as Defendants, have far broader latitude to interfere with contracts terminable at will than with binding contracts. *See Natural Design*, 485 A.2d at 674–75. In this case, the assertions made in Ultrasound's Opposition, *see* P's Opp. at ¶ 9 (characterizing the arrangement between Ultrasound and Shimadzu as a "business relationship"), and the few supporting letters attached to Ultrasound's Opposition, *see*

P's Ex. C (indicating that Ultrasound's "relationship" with Shimadzu products had been terminated), suggest, at most, that the relationship between Shimadzu and Ultrasound was a contract terminable at will. Thus, Defendants are granted wide leeway to interfere. *See Macklin v. Robert Logan Associates*, 639 A.2d 112, 118 (Md.1994) ("[A]s *Natural Design* recognizes, a contract terminable at will is more closely akin to the situation where no contract exists."). Because the evidence indicates that the relationship between Shimadzu and Ultrasound is similar to the situation where no contract exists, its claim surrounding Shimadzu is more properly considered as tortious interference with *economic relationships*. As previously stated, under *Natural Design* Defendants' conduct must be far more egregious then the sending of one letter, *see* P's Ex. B, in order to be cognizable as a tort under tortious interference with economic relationships. *See K & K Management, Inc. v. Lee*, 316 Md. 137, 557 A.2d 965, 979 (1989) ("The types of unlawful means which 'have been held to result in liability' for interference with prospective advantage were listed by Dean Prosser. They are 'violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith[.]'" (quoting W. PROSSER, HANDBOOK ON THE LAW OF TORTS, § 130, at 952–53 (4th ed.1971))).

■ Ultrasound's claim regarding interference with its relationship with Shimadzu is not alleged in its Complaint, and thus is not properly before the Court. Ultrasound "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint." *Zachair, Ltd. v. Driggs*, 965 F.Supp. 741, 748, n. 4 (D.Md.1997). Apparently recognizing this procedural de-

fect, albeit in an inexplicably late manner,[3] Ultrasound has belatedly moved to Amend its Complaint[4] to include such as assertion. The delinquency of Ultrasound's Motion to Amend is similar to its casual manner in responding to Defendants Motion for Summary Judgment and its failure to support its averments with documentation (for example, something as obvious as *the contract between Shimadzu and Ultrasound* ). These procedural failures underscore the frivolous nature of the claim concerning Shimadzu. Thus, Ultrasound's Motion for Leave to Amend the Complaint will, by separate order, be Denied.

■ Ultrasound also contends that the incident involving the Grand Hyatt rose to the level of a tortious interference with contract. This contention also fails because there is no indication in the record that the Defendants had any knowledge of the reservation contract between the Hyatt and Ultrasound. In fact, the record indicates that "[a]t no time before, during, or after the 2003 Annual Conference did I [Dr. Fine] believe that Mr. Zaglin and/or Plaintiff had a valid contract or room reservation for the suite I occupied during the. 2003 Annual Conference." D's Ex. 2 at ¶ 15. Thus, the third element of this tort is not met. *See Fraidin,* 611 A.2d at 1057.

■ Ultrasound's next Count alleges tortious interference with business (*i.e.* economic) relationships. Under Maryland law, "the elements of the tort of wrongful interference with contractual or business relationships [are] (1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice) and (4) actual damage and loss resulting." *Lyon v. Campbell,* 120 Md.App. 412, 707 A.2d 850, 859–60 (1998) (citing *Willner v. Silverman,* 109 Md. 341, 71 A. 962, 964 (1909)). For conduct to be actionable under this theory of tortious interference "the defendant's conduct must be 'independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships.'" *Lyon,* 707 A.2d at 860 (citing *Alexander v. Evander,* 336 Md. 635, 650 A.2d 260, 271 (1994)). "Wrongful or unlawful acts include common law torts and violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *Alexander,* 650 A.2d at 271 (citations omitted). A plaintiff must plead these egregious acts because "[a] broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved." *Macklin,* 639 A.2d at 117 (citing *Natural Design,* 485 A.2d at 674).

■ Ultrasound's tortious interference with economic relationships claim fails for numerous reasons. First, Defendants did not engage in any wrongful conduct of the type recognized by this tort. *See e.g., Alexander,* 650 A.2d at 271; *Macklin,* 639 A.2d at 117. The gravamen of Ultrasound's Complaint is that the Defendants

---

3. Ultrasound's Opposition to Defendants' Motion for Summary Judgment was filed on July 26, 2004. As previously noted, in its Opposition, Ultrasound raises, for the first time, the allegation of Defendants' interference with the relationship between it and Shimadzu. At that point, and most likely long prior to that date, Ultrasound was aware that its Complaint needed to be formally amended if such as assertion were to be included in its Opposition. Possessing this knowledge, at a minimum, on July 26, 2004, Ultrasound did not move to Amend its Complaint until October 1, 2004, long after the deadline for amending pleadings and after filing its Opposition.

4. The Court's Scheduling Order established a deadline of January 2, 2004 for the amendment of its pleadings.

refused to recognize it as a provider of ultrasound equipment and courses at The Society's events and on its website. This inaction on the part of the Defendants cannot be characterized as interference with business relationships by improper means under Maryland law because "one who, regardless of motive, causes harm to another merely by refusing to continue a business relationship terminable at will is not liable for that harm." *Lyon*, 707 A.2d at 861–62 (quoting *Purity Products, Inc. v. Tropicana Products, Inc.*, 702 F.Supp. 564, 575, n. 16 (D.Md.1988)). Even if the Defendants' decision to refuse recognition of Ultrasound as an American Society of Breast Surgeons approved provider harms Ultrasound's business, the requirement of wrongful conduct is not met. *See Lyon*, 707 A.2d at 863.

Second, there is no evidence that Defendants refusal to accredit Ultrasound was done with the intent to injure its business. Ultrasound's Complaint alleges that "Fine and the Society acted purposely to injure The Ultrasound Store by preventing them from participating in the Society's conferences and refusing to acknowledge the Ultrasound Store as providers of ultrasound equipment and free ... courses[.]" Compl. ¶ 37. This averment is directly rejected by both the sworn Affidavit of Dr. Richard Fine, *see* D's Ex. 2 (Fine Aff.) at ¶ 26 ("The Society and myself have never prevented Plaintiff from participating in its events to harm Plaintiff[.]"), and the sworn Affidavit of Jane Schuster, the Administrator of The Society from August 1998 to October 2000 and Executive Director of The Society from October 2000 to the present, *see* D's Ex. 6 (Schuster Aff.) at ¶ 20 ("The Society has never purposefully attempted to damage the Plaintiff's business relationship or business opportunity."). Ultrasound has not offered any evidence to the contrary. Thus, because "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" show that there is no genuine dispute of a material fact, *see* FED. R. CIV. P. 56(c), summary judgment in favor of the Defendants on Count II is appropriate.

■ Ultrasound's final count alleges a violation of both § 1 and § 2 of the Sherman Antitrust Act. 15 U.S.C. § 1 (2004). To prove a violation of Section 1 of the Sherman Act, "a plaintiff must establish two elements: (1) There must be at least two persons acting in concert, and (2) the restraint complained of must constitute an unreasonable restraint on interstate trade or commerce." *Estate Const. Co. v. Miller & Smith Holding Co., Inc.*, 14 F.3d 213, 220 (4th Cir.1994) (citing *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 702 (4th Cir.1991), *cert. denied* 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992)). Ultrasound's allegations do not meet the first element because there is no averment that two entities are acting in concert. Rather, Ultrasound's averments concern unilateral actions of The Society. These actions, or inactions, cannot give rise to a violation of § 1 of the Sherman Act. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (holding that § 1 of the Sherman Act does not "exclude coordinated conduct among officers or employees of the same company[ ]" nor does "an internal 'agreement' to implement a single, unitary firm's policies ... raise the antitrust dangers that § 1 was designed to police."); *see also Amer. Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc.*, 367 F.3d 212, 223–24 (4th Cir. 2004); *Oksanen*, 945 F.2d at 702 (4th Cir. 1991) (en banc) ("Proof of concerted action requires evidence of a relationship between at least two legally distinct persons or entities."). Moreover, the Supreme Court has specifically held that officers of a single entity cannot be deemed to be "separate economic actors pursuing sepa-

rate economic interests," thus "officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy." *Copperweld Corp.*, 467 U.S. at 769, 104 S.Ct. 2731 (1984). Following this clear precedent, neither Dr. Fine, nor The Society, can be liable for a violation of § 1 of the Sherman Act.

To support its § 2 claim, Ultrasound avers that "by refusing to acknowledge the Ultrasound Store ... Fine and the Society have monopolized the breast ultrasound equipment section and the surgeon breast [sic] ultrasound course section of the market[.]" Compl. ¶ 42. A quick reading of this averment illustrates the infirmities in Ultrasound's claim. The Supreme Court, albeit in the context of a suit brought under the Clayton Act, held that for a plaintiff to recover under a private antitrust suit, "Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The Court required this specific showing because "[t]he antitrust laws ... were enacted for the 'protection of competition not competitors.'" *Id.* at 488, 97 S.Ct. 690 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). In the case *sub judice*, Ultrasound has not made any allegations concerning injury to consumers (*i.e.* the type of injury against which the antitrust laws were designed to protect) flowing from the Defendants' actions. Significantly, Ultrasound has submitted no

discovery materials for the Court's consideration; thus, by definition, Ultrasound has failed to raise a disputed material fact regarding the allegedly stifled competitive environment and its injurious effect on consumers.

██ Ultrasound's claim also fails because it cannot meet the elements set forth for a violation of § 2 of the Sherman Act. "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). In order to prove that Defendants possess monopoly power, Ultrasound was required to submit evidence outlining a relevant market and Defendants' overwhelming market share of that market. *See generally, United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *United States v. Aluminum Co. of Amer.*, 148 F.2d 416, 424–27 (2d Cir.1945). As previously stated, Ultrasound has not offered any evidence concerning Defendants' market power in the ultrasound market.[5] Ultrasound's unsupported conclusion that whether "the Society has the power to greatly influence the buying decisions of the surgeons interested in ultrasound equipment[ ]" is a disputed material fact, P's Opp. at ¶ 4, is hopelessly inadequate at the summary judgment stage. *See e.g.*,

---

**5.** Defendants also point out, with support from an uncontradicted expert's report, *see* D's Ex. 9 (Aff. of Kenneth Basemen and Dr. Stephen Silberman's Report), that Ultrasound has not sufficiently alleged a product market in common with Defendants. With regard to the retail sales of breast ultrasound equipment, it is undisputed that Defendants do not

participate. D's Mot. at 21. With regard to ultrasound educational courses, it is undisputed that neither Defendant sells these courses. *Id.* at 22. Thus, if Defendants and Ultrasound are not competing in the same market, Defendants cannot be deemed to "monopolize" that market. *See* D's Ex. 9 (report) at 7–10.

*Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Moreover, Ultrasound's failure to produce evidence (in the form of expert reports or empirical data) concerning Defendants' market share compels this Court to enter summary judgment in favor the Defendants because "[f]ailure to adduce expert testimony on competitive issues such as market definition argues strongly in favor of granting summary judgment against an antitrust plaintiff." *Drs. Steuer & Latham, P.A. v. National Medical Enterprises, Inc.,* 672 F.Supp. 1489, 1512 n. 25 (D.S.C.1987), *aff'd,* 846 F.2d 70, 1988 WL 46286 (4th Cir.1988); *see also Cogan v. Harford Mem'l Hosp.,* 843 F.Supp. 1013, 1020 (D.Md.1994).

For these reasons, summary judgment must be granted for Defendants on Ultrasound's claim alleging a violation of §§ 1 and 2 of the Sherman Act.

## CONCLUSION

For the aforementioned, Defendants' Motion for Summary Judgment will, by separate order, be GRANTED and Plaintiff's Motion to Amend the Complaint will, by separate order, be DENIED. Additionally, Plaintiff's Motion for Leave to File a Surreply will, by separate order, be DENIED.

### *ORDER*

Having considered Defendants' Motion for Summary Judgment [Paper No. 35], Plaintiff's Motion for Leave of Court to Amend Plaintiff's Complaint [Paper No. 40], Plaintiff's Motion for Leave to File Plaintiff's Sur–Reply to Defendant's Motion for Summary Judgment [Paper No. 41], the oppositions thereto, and for the reasons stated in the accompanying Memorandum Opinion, it is this 25th day of February, 2005, by the United States District Court for the District of Maryland,

**ORDERED**, that Defendants' Motion for Summary Judgment [Paper No. 35] is **GRANTED**; and it is further

**ORDERED**, that Plaintiff's Motion for Leave of Court to Amend Plaintiff's Complaint [Paper No. 40] is **DENIED**; and it is further

**ORDERED**, that Plaintiff's Motion for Leave to File Plaintiff's Sur–Reply to Defendant's Motion for Summary Judgment [Paper No. 41] is **DENIED**; and it is further

**ORDERED**, that Judgment for Costs be entered in favor of Defendants American Society of Breast Surgeons and Dr. Richard Fine; and it is further

**ORDERED**, that the Clerk is directed to **CLOSE THE CASE.**